## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**STACY TYMAN,**
**SONAL KEENAN BHATIA,**
**RANDI MAVES**, individually
and on behalf of all others similarly situated,

      Plaintiffs,

  v.

**CCRM PARENT HOLDINGS, INC.,**
**CCRM PRACTICE, LLC,**
**AND CCRM MANAGEMENT**
**COMPANY HOLDINGS, LP**

      Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiffs Stacy Tyman, Sonal Keenan Bhatia, and Randi Maves ("Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned attorneys, allege as follows based upon personal knowledge as to the individual allegations pertaining to each of them, and the investigation of their counsel, against Defendants CCRM Parent Holdings, Inc., CCRM Practice LLC, and CCRM Management Company Holdings, LP (collectively, "CCRM" or "Defendants").

### <u>NATURE OF THE ACTION</u>

1.    Plaintiffs bring this class action lawsuit to recover economic losses suffered by Plaintiffs and Class members (defined below) as a result of the false, deceptive, unfair, and

1

misleading advertising, marketing, and promotion of Defendants' Comprehensive Chromosome Screening ("CCS"), also known as preimplantation genetic testing for aneuploid ("PGT-A" or "PGT-A testing"). Plaintiffs and Class members each spent thousands of dollars for PGT-A based on Defendants' material misrepresentations and omissions.

2.     Plaintiffs file this lawsuit to remedy Defendants' unfair and deceptive business practices arising from its marketing and sale of PGT-A testing as a proven, accurate, and reliable method to decrease the chance of miscarriage and increase the chance of giving birth to a healthy baby when science does not support this. Defendants' misleading statements and omissions as described in detail below are false and misleading to any reasonable consumer because PGT-A is unproven, inaccurate, and unreliable.

## INTRODUCTION

3.     According to the World Health Organization in April 2023, one in six people worldwide experience infertility. One-third of the people in the United States have sought or know someone who has sought fertility treatments or assisted reproductive technology ("ART") to assist them in becoming pregnant.

4.     According to the United States Centers for Disease Control ("CDC"), as of 2021, approximately 2.3% of all infants born in the United States each year are conceived using ART, and that percentage is growing.

5.     According to The American Society of Reproductive Medicine ("ASRM") in 2022, the number of babies in America born from *in vitro* fertilization ("IVF") increased from 89,208 in 2021 to 91,771 in 2022, indicating that 2.5% of all births in the United States are a result of successful ART cycles. The total number of IVF cycles performed increased by over 6% from 2021, from 368,502 in 2021 to 389,993 in 2022.

6.     The demand for IVF is growing, thus providing economic opportunity for investors wishing to take advantage of this increasing market.

7.     There are now approximately 450 fertility clinics in the United States performing IVF and a huge majority of these procedures are not covered by insurance, as many states do not mandate insurance for IVF.

8.     The IVF process begins with medication taken by women to stimulate the follicles to create several mature eggs for collection. Once the eggs are retrieved from the ovaries, they are then fertilized by the fertility clinic with sperm to create embryos. If the embryos reach the blastocyst stage, they are then ready for implantation to see if they will result in a pregnancy.

9.     PGT-A testing is marketed and sold by Defendants as an add-on to the IVF process and purports to screen embryos for chromosomal abnormalities to determine which embryos are "euploid" or best suited for implantation and which embryos are "aneuploid" or abnormal and not suited for implantation.

10.     PGT-A testing is marketed and sold by Defendants to people pursuing IVF as having some of the highest success rates in the nation, significantly reducing the risk of miscarriage (less than 5%), increasing live birth rates, increasing the chance of pregnancy, delivering the highest rate of chromosomally normal embryos for patients and lowest rates of mosaic embryos in the world, reporting the lowest chromosomal mosaicism rates in the United States, and providing the fastest path to a successful live birth. Defendants also sell their PGT-A testing as 95-98% accurate.  Based on these material representations and the material omissions that underlay them as detailed below, Plaintiffs and Class members purchased PGT-A testing from Defendants.

11.     The above representations by Defendants are false and/or misleading and deceptive based upon the omission of material information. Studies show that when looking at clinic

3

pregnancy, miscarriage, or live-birth rates, there is no difference between cycles utilizing PGT-A and cycles not utilizing PGT-A. Studies also show the accuracy rating for PGT-A is significantly lower than advertised.

12.     Defendants' false and misleading statements have severe consequences, including causing ascertainable economic losses in the thousands of dollars suffered by Plaintiffs and Class members.

13.     Insurance companies have independently determined that there is insufficient basis to support the use of PGT-A. Thus, PGT-A testing is rarely covered by insurance and is primarily sold to consumers as an additional out-of-pocket expense in addition to the expensive cost of IVF.

14.     For example, the largest health insurance company in America, United Healthcare, has noted that PGT-A is unproven and not medically necessary due to "insufficient evidence of efficacy." United Healthcare further states with respect to PGT-A that "[t]here is insufficient evidence to support the use of PGT for aneuploidy screening at this time."[1]

15.     Likewise, another large health insurance company, Aetna, states that PGT-A testing is "experimental, investigational, or unproven."[2]

16.     As detailed below, these conclusions by United Healthcare, Aetna, and other insurance companies are in line with conclusions reached by major professional health organizations in the area of women's health.

17.     Embryos that are assigned an "abnormal" or "aneuploid" testing result (i.e., embryos that are designated as having an abnormal number of chromosomes) by Defendants are

---

[1]  United Healthcare Commercial and Individual Exchange Medical Policy, Preimplantation Genetic Testing and Related Services, effective date June 1, 2024.
[2] See https://www.aetna.com/cpb/medical/data/300_399/0358.html.

not transferred and are typically discarded due to patients being told that "abnormal" embryos as determined by Defendants' PGT-A testing are unsuitable for transfer. [3]

> After CCS, only embryos that have the correct number of chromosomes are selected for transfer.

18.      In fact, Defendant *does not permit* patients to transfer embryos with an abnormal result. Patients are only allowed to select embryos with an abnormal result be either a) utilized for research or b) discarded.[4]

Embryos determined to be aneuploid will be either (select one):

_____ Utilized to facilitate ongoing improvements and advances in CCS, PGT and CCRM research; or

__X__ Discarded in accordance with normal laboratory procedures and applicable laws.

19.      Despite scientific research and studies showing insufficient evidence of efficacy, the use of PGT-A has spiked in recent years due to Defendants' marketing and advertising. For example, from 2014 to 2021, the use of PGT-A testing increased from being utilized in 13% of IVF cycles to approximately 40% of IVF cycles.

20.      The PGT-A testing industry now generates an estimated revenue of between $300 million to $400 million dollars per year.

21.      Defendants have known for years that there is insufficient evidence of efficacy of PGT-A, and that their CCS testing does not have the highest success rates in the nation, does not significantly reduce the risk of miscarriage (less than 5%), does not increase live birth rates, does not increase the chance of pregnancy, does not deliver the highest rate of chromosomally normal embryos for patients, does not report the lowest chromosomal mosaicism rates in the United States,

---

[3] https://www.ccrmivf.com/services/comprehensive-chromosome-screening-ccs/ (last visited February 13, 2025).
[4] CCRM Preimplantation Genetic Testing (PGT) and/or Comprehensive Chromosome Screening (CCS) with Embryos Transfer Consent, Acknowledgment and Release.

and does not provide the fastest path to a successful live birth. Despite that, Defendants have continued to aggressively promote CCS to vulnerable and unsuspecting consumers.

22.    Defendants have known for years that its CCS testing is not 95-98% accurate.

23.    Defendants have acted to mislead patients with their false and deceptive marketing and advertising statements, and material omissions, in exchange for the opportunity to reap millions of dollars in profit each year from selling PGT-A testing as an add-on to IVF treatment.

24.    Plaintiffs and Class members have relied on Defendants' false and deceptive marketing and advertising statements, and material omissions in purchasing PGT-A testing, and have suffered economic losses as a direct result.

25.    Plaintiffs and Class members would not have purchased PGT-A testing from Defendants had they known the truth, as detailed below, and seek all available damages, equitable relief, and other remedies from Defendants as alleged herein.

## PARTIES

26.    Plaintiff Stacy Tyman is a resident of Mount Prospect, Illinois and received fertility treatment in Lone Tree, Colorado.

27.    Plaintiff Sonal Keenan Bhatia is a resident of New York City, New York and received fertility treatment in New York City, New York.

28.    Plaintiff Randi Maves is a resident of Denver, Colorado and received fertility treatment in Denver, Colorado.

29.    Defendant CCRM Parent Holdings, Inc. is incorporated in Delaware and headquartered at 9380 Station Street, Suite 425, Lone Tree, Colorado, 80124.

30.    Defendant CCRM Practice LLC, is headquartered at 10290 RidgeGate Circle, Lone Tree, Colorado, 80124.

31.    Defendant CCRM Management Company Holdings, LP in incorporated in Delaware and headquartered at 9380 Station Street, Suite 425, Lone Tree, Colorado, 80124.

32.    All three Defendants have operated and worked together as alter egos of one another under the name "CCRM Fertility" as a "global pioneer in fertility science, research and treatment" offering patients "best-in-class patient care and access to a network of award-winning physicians, a full suite of fertility services, innovation technology and cutting-edge labs."[5]

33.    PGT-A testing is performed by Defendants at its laboratory in Lone Tree, Colorado California.

34.    Defendants market, advertise, and promote PGT-A in Colorado and throughout the United States.

## JURISDICTION AND VENUE

35.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(3)(B) and (D) because: (i) there are 100 or more Class members; (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs; and (iii) some Plaintiffs and Class members and Defendants are residents of different states.

36.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

37.    The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Defendants within, affecting, and emanating from, the State of Colorado. Defendants regularly conduct and/or solicit business in, engage in other persistent courses of conduct in, and/or derives substantial revenue from services provided to persons in the

---

[5] https://www.ccrmivf.com/about-us/ (last visited February 13, 2025).

State of Colorado. Defendants have engaged, and continues to engage, in substantial and continuous business practices in the State of Colorado and across the country.

38.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the State of Colorado, including within this District.

## SUBSTANTIVE ALLEGATIONS

### A.  Background Concerning IVF

39.     IVF is a process of fertilization in which an egg is combined with sperm in vitro ("in glass").

40.     To prepare for egg retrieval, certain drugs and hormone therapies are taken orally and by injection over several weeks to stabilize the uterine lining, stimulate the ovaries into producing follicles, and stop the ovary follicles from releasing eggs. The injections often result in bruising, swelling, and discomfort. The drugs and hormones often also trigger side effects including fatigue, nausea, headaches, allergic reactions, and blood clots, as well as negative emotions and mood swings.

41.     After eggs are determined to be ready for retrieval, an ovulation trigger injection is performed. The patient then proceeds to an operating room for egg retrieval, where she is sedated or placed under general anesthesia and undergoes insertion of a needle through the vaginal wall and into each follicle in the ovary to drain the follicles of their fluid. The fluid in the follicle is then extracted into a test tube and studied under a microscope to look for eggs.

42.     Residual pain from the egg retrieval procedure can last for several days. Some patients suffer significant side effects such as ovarian hyperstimulation syndrome that causes the ovaries to painfully swell and can lead to hospitalization.

43.     The extracted eggs are then fertilized with sperm in a laboratory to create embryos.

44.     If PGT-A testing is not performed on the embryos, after the fertilized egg (zygote) undergoes embryo culture for 2-6 days, it may then be transferred by catheter into the uterus with the intention of establishing a successful pregnancy.

45.     If PGT-A testing is performed, a biopsy is taken from the trophectoderm component of the embryo (meaning the outer layer of the blastocyst) after the embryo reaches the blastocyst stage of development.

46.     During the biopsy, the embryologist creates a hole in the embryo's zona pellucida which allows for the removal of five to ten cells from the trophectoderm component of the embryo.

47.     For those who purchase PGT-A testing, the removed cells are then sent to Defendants' laboratory in Lone Tree, Colorado for PGT-A testing.

48.     Meanwhile, the embryos are frozen and stored at Defendants' clinic while testing is performed.

49.     Embryos are fragile and vulnerable to damage from biopsy and the freezing and thawing process necessary for PGT-A testing to be performed.[6]

50.     For this reason, experts caution that performing additional biopsies for PGT-A testing, which requires thawing and refreezing the embryo, can cause additional damage to the embryo and negatively affect IVF outcomes.[7] It can also result in a reduced chance of pregnancy.[8]

51.     As a result, if Plaintiffs and Class members were aware of the true efficacy and accuracy rates of PGT-A testing, they would forego such testing.

---

[6] Aluko, A., et al., *Multiple cryopreservation – warming cycles, coupled with blastocyst biopsy, negatively affect IVF outcomes.* Reproductive Biomedicine Online. Vol. 42, Issue 3. March 2021.
[7] *Id.*
[8] Bradley, Cara. *Impact of multiple blastocyst biopsy and vitrification – warming procedures on pregnancy outcomes.* Fertility and Sterility. Vol. 108, Issue 6. December 2021.

52.     Defendants are aware of the lengths to which individuals undergoing IVF go to create embryos, their emotional and financial investment in assuring the viability of their embryos, and their expectations that any genetic testing should not be sold in a misleading and deceptive manner.

53.     In some cases, additional procedures with additional costs may be purchased by those undergoing IVF, including (a) intracytoplasmic sperm injection ("ICSI") to increase the chance for fertilization; (b) assisted hatching of embryos to potentially increase the chance of embryo attachment ("implantation"); and (c) cryopreservation (freezing) of eggs or embryos.

54.     Embryos are precious and irreplaceable. Human eggs, also known as oocytes, are a limited resource. A woman has about one million eggs at birth and this supply diminishes at a rate of about 1,000 eggs per month as part of the natural aging process.

55.     The loss of oocytes from the ovaries continues in the absence of menstrual cycles, and even during pregnancy, nursing, or taking of oral contraceptives.

56.     Egg quality, too, diminishes with time, with miscarriages and chromosomal abnormalities occurring more frequently for older women than for younger women.

57.     Defendants' PGT-A testing sold to Plaintiffs and Class members has substantial ramifications including, without limitation, the costs that are paid for such testing, and the additional costs of related procedures.

58.     Defendants promote PGT-A as an add-on to the IVF process and strongly encourage individuals to purchase PGT-A to determine which embryos are suitable to transfer.

59.     PGT-A testing can and does result in the unnecessary loss of embryos.

60.     PGT-A testing can and does result in embryos that could result in live births not being transferred.

10

61.  PGT-A testing can and does result in embryos that could result in live births being discarded.

62.  PGT-A testing can and does result in additional egg retrievals.

63.  PGT-A testing can and does provide false positives and false negatives.

64.  PGT-A testing can and does result in important decisions being made during IVF based upon inaccurate information.

65.  PGT-A testing can and does result in embryos being unable to be transferred.

66.  In selling PGT-A to consumers, Defendants represent that their PGT-A testing (a) has some of the highest success rates in the nation, (b) significantly reduces the risk of miscarriage (less than 5%), (c) increases live birth rates, (d) increases the chance of pregnancy, (e) delivers the highest rate of chromosomally normal embryos for patients, (f) reports the lowest chromosomal mosaicism rates in the United States, (g) provides the fastest path to a successful live birth, and (h) is 95-98% accurate.

67.  These representations are false and misleading, and Plaintiffs and Class members would not have purchased PGT-A testing from Defendants had they known the truth about PGT-A testing, which Defendants misrepresented and materially omitted.

**B.  History of PGT-A Testing**

68.  Preimplantation genetic testing was pioneered by Yuri Verlinsky and his colleagues beginning in the late 1980s.

69.     In 1996, the hypothesis was first proposed that preimplantation genetic screening ("PGS") that eliminated aneuploid embryos prior to transfer would improve implantation rates of remaining embryos in IVF, increase pregnancy and live birth rates, and reduce miscarriages.[9]

70.     In reaching this hypothesis, the authors made at least five assumptions: (a) most IVF cycles fail because of aneuploid embryos; (b) their elimination prior to embryo transfer will improve IVF outcomes; (c) a single trophectoderm biopsy ("TEB") at blastocyst stage is representative of the whole trophectoderm ("TE"); (d) TE ploidy reliably represents the inner cell mass ("ICM"); and (e) ploidy does not self-correct downstream from blastocyst stage.

71.     Based upon these assumptions, PGS began to be marketed as an add-on to IVF treatments, with promises of improved outcomes and reduced miscarriage rates.

72.     Initially, PGS was proposed by polar body biopsy, and eventually, technology was implemented to a more invasive cleavage state embryo biopsy.

73.     This method, described as PGS 1.0, became increasingly popular despite that researchers in 2005 were still unable to demonstrate outcome benefits.[10]

---

[9] Verlinsky, Y. and Kuliev, A., *Preimplantation diagnosis of common aneuploidies in infertile couples of advanced maternal age*. Hum. Reprod. 1996, 11:2076-7.

[10] Staessen C, Platteau P, Van Assche E, Miciels A, Tournaye H, Camus M, Devroey P, Liebaers I, van Steirteghem A. *Comparison of blastocyst transfer with and without preimplantation genetic diagnosis for aneuploidy screening in women of advanced maternal age: a prospective randomized controlled trial*. Hum Reprod. 2005;19:2849–58. 16. Platteau P, Staessen C, Michiels A, Van Steirteghem A, Liebaers I, Devroey P. *Preimplantation genetic diagnosis for eneuploidy screening in women older than 37 years. Fertil Steril*. 2005;84:319–24. 17. Platteau P, Staessen C, Michiels A, Van Steirteghem A, Liebaers I, Devroey P. *Preimplantation genetic diagnosis for aneuploidy screening in patients with unexplained recurrent miscarriages*. Fertil Steril. 2005;83:393–7.

74.     Despite concerns with testing as early as its inception in 1996, Defendants were the "first fertility clinic to offer PGT-A, also known as CCS, on a day five of six embryo starting in 2007."[11]

75.     In 2008, a randomized clinical trial sought to study one of the above-stated hypotheses: whether the effect of PGS on live births rates differs in women of advanced maternal age with variable risks for embryonic aneuploidy, and weighed these effects against the results obtained after IVF without PGS.[12]

76.     The authors of this study concluded that PGS had no clinical benefit over standard IVF in women of advanced maternal age regardless of their risk for embryonic aneuploidy.[13]

77.     In 2011, researchers conducted a meta-analysis of randomized control trials on the effect of PGS on the probability of live birth after IVF.[14]

78.     The authors of this meta-analysis found that there is no evidence of a beneficial effect of PGS as currently applied on the live birth rate after IVF.[15]

79.     In addition, the authors determined that PGS significantly *lowers* the live birth rate for women of advanced maternal age. The authors noted that technical drawbacks underlie the inefficiency of PGS.[16]

---

[11] https://www.ccrmivf.com/genetics/ (last visited February 13, 2025).
[12] Twisk, M., Mastenbroek, S., et al., *No beneficial effect of preimplantation genetic screening in women of advanced maternal age with a high risk for embryonic aneuploidy*. Human Reproduction, Vol,23, No. 12 pp. 2813-2817 (2008).
[13] *Id.*
[14] Mastenbroek, S. *Preimplantation genetic screening: a systemic review and meta-analysis of RCTs*. Human Reproduction Update, Vol.17, No.4, 454-466 (2011).
[15] *Id.*
[16] *Id.*

80.    The authors cautioned that new approaches in the application of PGS should be carefully evaluated before introduction into clinical practice.[17]

81.    In a 2013 paired randomized clinical trial on 116 patients, scientists sought to evaluate if cleavage[18] or blastocyst stage embryo biopsy affects reproductive competence.[19]



82.    Until this time, most biopsies for PGS were performed at the cleavage stage of embryogenesis, whereas less than one percent (1%) were being performed on blastocyst stage.

83.    The authors concluded that cleavage-stage biopsy markedly reduced embryonic reproductive potential.[20]

84.    They further concluded that until laboratories demonstrated safety by applying a similar powerful study design, there remained insufficient evidence that biopsy at the blastocyst stage could be safely performed without impacting the reproductive potential of human embryos.[21]

85.    Soon thereafter, however, the PGS testing labs began trophectoderm biopsy at the blastocyst stage without conducting further appropriate studies.

86.    To perform PGT-A, DNA must be obtained from embryos for analysis.

---

[17] *Id.*
[18] Cleavage stage refers to embryos at day 2-3 while blastocyst refers to embryos at day 5-6.
[19] Scott, R., et al., *Cleavage-stage biopsy significantly impairs human embryonic implantation potential while blastocyst biopsy does not: a randomized and paired clinical trial*, Fertility and Sterility Vol. 100, No. 3, September 2013 0015-0282.
[20] *Id.*
[21] *Id.*

87.    The approach most widely adopted in practice today to obtain DNA is by performing a biopsy from a blastocyst 5 to 6 days after conception.

88.    The blastocyst is made up of embryonic cells and extraembryonic cells.

89.    The embryonic cells form the inner cell mass ("ICM") of the blastocyst, which will lead to the development of the fetus, and the extraembryonic cells form the trophectoderm of the blastocyst which will form the placenta.

90.    The biopsy is taken from the trophectoderm which is made up of extraembryonic cell lineage cells. This extraembryonic cell DNA is then analyzed to determine if the embryo contains a normal or abnormal number of chromosomes.

91.    For PGS testing results, the number of chromosomes detected from the biopsied cells, taken from the trophectoderm, are interpreted to be representative of the entire embryo including the inner cell mass.

92.    Laboratories performing preimplantation genetic testing proclaim that if testing results show a normal number of chromosomes in the biopsy, then the embryo should be considered euploidy (the word comes from the Greek word *eu*, which means true or even), which means it has a higher chance of successful implantation and live birth. In contrast, if testing shows an abnormal number of chromosomes in the biopsy, then the embryo should be considered aneuploid.

93.    The trophectoderm biopsy at blastocyst stage, referred to as PGS 2.0, was considered by PGS proponents as more accurate than PGS 1.0, and quickly replaced the earlier method.

94.    There were, however, no properly conducted studies to assess PGS 2.0 accuracy and whether the new method increased implantation and reduced miscarriage rates.

95.     When embryo biopsy moved from cleavage to blastocyst stage, and selected chromosome investigations went to full chromosomal analyses with a newly developed diagnostic platform for conducting PGS 2.0, the assumption was that PGS would finally show its effectiveness. This, however, did not happen.

96.     Thus, genetic laboratories questioned whether other platforms could more accurately determine embryo ploidy.

97.     In a 2016 study, researchers tested embryos that had previously been tested and deemed aneuploid.[22] Six out of eleven embryos upon retesting were determined to be either definitively normal or mosaic with the potential to be normal, thus offering a chance for pregnancy if transferred.[23]

98.     The authors of this 2016 study concluded that while the study was small, it suggested a potential false positive rate of almost 55% and an intra-embryo discrepancy of almost 50%.[24]

99.     Further, of the eleven embryos originally deemed abnormal, eight patients decided to undergo a transfer, and five of those eight transfers resulted in the delivery of healthy newborns.[25]

100.    Based upon their findings, the authors urged careful reassessment of PGS considering its increasing use.[26]

---

[22] Gleicher, N., et al., *Accuracy of preimplantation genetic screening (PGS) is compromised by degree of mosaicism of human embryos*, Reproductive Biology and Endocrinology (2016) 14:54.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*

101.    In another 2016 study, researchers analyzed assisted reproductive technology in the United States from 2011 to 2012 and found that overall PGS was associated with a decreased live birth rate when compared to IVF without PGS.[27]

102.    In yet another study in 2016, researchers re-biopsied 37 embryos determined to be "abnormal" and found that 33% of embryos originally reported to be "aneuploid" were found to be "euploid" upon repeat assessment.[28] This study further demonstrated PGS testing's inability to accurately differentiate between euploidy and aneuploidy of any given embryo.

103.    Furthermore, in 2016, researchers in a mouse study found that mosaic embryos were able to self-correct and that aneuploid cells were progressively depleted from the blastocyst stage on.[29]

104.    The findings suggested that it may be biologically impossible to accurately assess an embryo's viability with a single trophectoderm biopsy at blastocyst stage.[30]

105.    By this time, proponents of PGS were aware of the above scientific literature that a problem existed with the results of PGS and that there was a problem with strictly defining embryos as either euploid or aneuploid, with the known resulting consequences of delivering aneuploid test results to patients.

106.    Defendants, however, did not incorporate this knowledge into their marketing and advertising to inform their patients about the problems and issues inherent in PGS testing.

---

[27] Kushnir, VA, et al., *Effectiveness of in vitro fertilization with preimplantation genetic screening: a reanalysis of Unites States assisted reproductive technology data 2011-2012*. Fert Steril, 2016; 106(1): 75-9.

[28] Tortoriello D., et al., *Reanalysis of human blastocysts with different molecular genetic screening platforms reveals significant discordance in ploidy status*. Fert Steril, 2016; 106(1).

[29] Bolton, H., et al., *Mouse model of chromosome mosaicism reveals lineage-specific depletion of aneuploid cells and normal development potential*. Nat Commun 7, 11165 (2016). https://doi.org/10.1038/ncomms11165.

[30] *Id.*

107.    Despite the mounting research as of 2016, the Preimplantation Genetic Diagnosis International Society ("PGDIS") published practice guidance for PGS on its website for the first time in July 2016.

108.    At the same time, PGDIS announced a name change from PGS to PGT-A. Notably, this change replaced the term "screening" with the term "testing."

109.    PGDIS is heavily influenced by and comprised of influential members of the genetic testing industry and has its headquarters located at a genetic testing laboratory.

110.    PGDIS was cofounded by Yuri Verlinsky, who created a genetic testing company, Reproductive Genetic Innovations, Inc. ("RGI"), and Santiago Munne, who co-founded the genetic testing companies, Reprogenetics and Recombine, and works with multiple genetic testing companies.

111.    In fact, PGDIS has its headquarters at the same location as RGI, another genetic testing laboratory that markets and sells PGT-A.

112.    The PGDIS guidelines contained no references to valid scientific literature and were published without being subject to peer review.

113.    Research conducted the following year in 2017 shed even more light on the issues with PGS testing, now known as PGT-A. Specifically, the authors conducted a review of 455 publications related to testing and concluded that all five assumptions made in 1996 are scientifically unsupportable and the hypotheses of PGS were discredited.[31]

114.    The authors of the 2017 review urged testing for the purpose of research and acknowledged that not one properly analyzed study had been able to demonstrate clinical outcome

---

[31] Gleicher, N, Orvieto, R. *Is the hypothesis of preimplantation genetic screening (PGS) still supportable? A review.* Journal of Ovarian Research (2017) 10:21

benefits and, indeed, increasing evidence suggested that at least in unfavorable patient populations (*i.e.*, older patients) who were considered the best candidates for the test, testing may instead reduce pregnancy and live birth chances.[32]

115.    Instead of undertaking randomized and properly structured studies, Defendants continued to falsely promote and tout the benefits of PGS testing and PGT-A testing to IVF patients without appropriate validation or scientific support.

116.    In addition, as "pioneers" of PGT-A, the Defendants "implemented technology changes over the years allowing for developments in the laboratory to be tested and transferred into clinical practice".[33]

117.    Thereafter, PGT-A testing proponents pivoted yet again, and suggested that aneuploid embryos would now be divided into two diagnostic categories, mosaic and aneuploid. However, the thresholds of classification for euploid, mosaic, and aneuploid embryos were not based on appropriate peer reviewed scientific research.

118.    In another study in 2017, a researcher sought to analyze the clinical reliability of PGT-A results and the resulting loss of what may be viable embryos.[34] The author estimated that the proportion of normal embryos that are discarded based upon faulty results may be as high as 40%. The author noted that this would lead to an overall decrease in the cumulative pregnancy rate achievable.[35]

---

[32] *Id.*

[33] https://www.ccrmivf.com/genetics/ (last visited February 14, 2025).

[34] Paulson, R., *Preimplantation genetic screening: what is the clinical efficiency?* Fert. Ster. Vo. 108, No. 2, August 2017.

[35] *Id.*

119.    In 2018, an abstract titled *The Emperor Still Looks Naked* was published in Reproductive Biomedicine criticizing PGS/PGT-A as a novel technology that has seen widespread implementation without scientific support.[36]

120.    The author commented, "I have been appalled at the implementation into clinical practice of novel technology without the appropriate underpinning science. Saddest of all is the peddling, not infrequently for substantial pecuniary gain, of these unproven techniques to vulnerable people – older age women, or those with repeated IVF failure or recurrent miscarriage – as miracle treatments that will change their blighted lives."[37] The author called for registered, randomized, properly structured, non-commercial trials before clinical application of a technology that can lead to such devastating consequences like viable embryo destruction.

121.    Subsequently, no such study was conducted, and no such study was sponsored or proposed by Defendants.

122.    Instead, Defendants continued their marketing efforts to obtain greater market share in the IVF industry and continued not to disclose the truth about PGT-A to their vulnerable patients.

123.    In 2018, the American Society for Reproductive Medicine ("ASRM") and the Society for Assisted Reproductive Technology ("SART") issued a committee opinion on PGS/PGT-A, concluding that "the value of PGS/PGT-A as a screening test for IVF patients has yet to be determined."[38]

---

[36] Braude P. *The Emperor Still Looks Naked*. Reprod Biomed Online. 2018 Aug;37(2):133-135. doi: 10.1016/j.rbmo.2018.06.018. PMID: 30075840.
[37] *Id.*
[38] Penzias, A., et al., *The use of preimplantation genetic testing for aneuploidy (PGT-A): A committee opinion.* Fertility and Sterility, Vol. 109, No. 3, March 2018.

124.    Defendants, however, materially omitted to inform their patients and potential patients of this important pronouncement by the leading professional organization for reproductive medicine.

125.    In 2019, Santiago Munne, conducted a randomized controlled trial to evaluate the benefit of PGT-A for embryo selection in frozen-thawed embryo transfer.[39]

126.    Mr. Munne and his fellow researchers found that PGT-A did not improve overall pregnancy outcomes, did not improve live birth rates, and did not reduce miscarriage rates.[40]

127.    Commentary published following this study included the following: "Considering all presented evidence, it is difficult to understand what further argument can be made for the continuous routing clinical utilization of PGT-A to improve IVF outcomes."[41]

128.    Defendants, however, continued to promote PGT-A for all their patients and with representations that their PGT-A has some of the highest success rates in the nation, significantly reduces the risk of miscarriage (less than 5%), increases live birth rates, increases the chance of pregnancy, delivers the highest rate of chromosomally normal embryos for patients, reports the lowest chromosomal mosaicism rates in the United States, and provides the fastest path to a successful live birth, while omitting to inform patients concerning the truth about PGT-A.

129.    In 2020, Dr. Richard Paulson cautioned about PGT-A being actively marketed as a mature technology by overstating its benefits and underestimating its losses.[42]

---

[39] Munne, S., et al., *Preimplantation genetic testing for aneuploidy versus morphology as selection criteria for single frozen-thawed embryo transfer in good-prognosis patients: a multicenter randomized clinical trial.* Fertility and Sterility, Vol. 112, No. 6, December 2019.
[40] *Id.*
[41] Orvieto, R., *Preimplantation genetic testing for aneuploidy (PGT-A- finally revealed.* Journal of Assisted Reproduction and Genetics (2020) 37-669-672.
[42] Paulson, R. *Hidden in plain sight: the overstated benefits and underestimated losses of potential implantations associated with advertised PGT-A success rates.* Human Reproduction, Vol. 35, Issue 3, p. 490-493 (March 2020).

130.    Dr. Paulson noted that the marketing of PGT-A as accurate, having minimal errors, and applicable to IVF patients generally was not supported with evidence-based science and that the losses of potential implantations are evident. Dr. Paulson called for scientific scrutiny of the available PGT-A data.[43]

131.    In addition, an assessment was done of IVF and PGT patient education materials, which also raised concerns.

132.    The United States Centers for Disease Control and Prevention ("CDC") requires that patient education materials be written at or below a fifth-grade reading level, but researchers found that among the educational materials examined, none met the CDC standard.[44]

133.    These findings suggested that patient educational materials concerning PGT-A may not always be comprehensible or clear to all patients. Lack of appropriate educational materials that present information about PGT-A in an accessible, unbiased, and comprehensible manner have the potential to lead to disparities in the use of PGT-A because patient educational materials have exceeded the average literacy skills of U.S. residents.[45]

134.    Additional research in 2020 also continued to show that live birth rates for PGT-A should be calculated per cycle, instead of per transfer.[46] The authors of the 2020 study found that

---

[43] *Id.*

[44] Early, M., et al., *Literary assessment of preimplantation genetic patient education materials exceed national reading levels*, Journal of Assisted Reproduction and Genetics, Vol.37, p. 1913-1922, (2020).

[45] Yang, H., et al., *Preimplantation genetic testing for aneuploidy: Challenges in clinical practice*, Human Genomics, article 69 (2022).

[46] Doody, K. *Live Birth Rate Following PGT Results in Lower Live Birth Rate Compared to Untested Embryos Transferred at Day 5/6.* Fertility and Sterility. Vol. 114, Issue 3, Supplement E419 (September 2020).

PGT-A resulted in a lower chance of live birth in all age groups compared to transfer of embryos without PGT-A.[47]

135.    In November 2021, the preeminent New England Journal of Medicine published the results of a randomized controlled trial to assess whether PGT-A improves the cumulative life-birth rate as compared with conventional IVF.[48]

136.    The authors concluded that "conventional IVF treatment was noninferior to PGT-A and resulted in a higher cumulative live-birth rate in women with a good prognosis for a live birth."[49]

137.    The authors also noted that "the results of trophectoderm biopsy may not totally represent the genetic composition of the inner cell mass of the blastocyst that is the precursor to the embryo, and subsequent cell division may also eliminate a genetically abnormal cell line."[50]

138.    The authors of the study concluded:

   a.    Trophectoderm biopsy may be harmful;[51]

   b.    No benefit for PGT-A regardless of age on cumulative live-birth rate;[52] and

   c.    No benefit for PGT-A for ongoing pregnancy and live birth rates after first frozen embryo transfer.[53]

139.    Also in 2021, researchers reviewed the literature on PGT-A as a precursor to the possibility of advancing technology to a non-invasive test for aneuploidy. In their analysis, the authors recognized:

---

[47] *Id.*

[48] Yan, J., et al., *Live Birth with or without Preimplantation Genetic Testing for Aneuploidy*, N. Engl. J. Med. 385;22, November 25, 2021.

[49] *Id.*

[50] *Id.* at 2054.

[51] *Id.* at 2056.

[52] *Id.*

[53] *Id.*

    a.      That it is possible for normal embryos to be misdiagnosed as mosaic thus unsuitable for transfer, that ultimately will self-correct and lead to a live birth;

    b.      Studies do not support the use of PGT-A for all couples who undergo IVF, even in women on the older end of the age spectrum (35-40), who theoretically have the most to gain;

    c.      Improved live birth rates with PGT-A have not been consistently reported; and

    d.      Whether PGT-A improves live birth outcomes has yet to be proven.[54]

140.    Despite these findings, Defendants continued to advertise and misrepresent non-existent benefits of PGT-A that are not supported by science to vulnerable consumers, while at the same time omitting material information concerning the efficacy of PGT-A.

141.    The finding related to self-correction of embryos was also researched in 2020 when 1,000 embryos with mosaic result were

142.    Another study in 2021 also reconfirmed a known observation that term placentas, which are what the trophectoderm becomes, are inherently mosaic, characterized by a substantial number of chromosomal abnormalities, even if the fetus is completely euploid.[55]

143.    The results of the 2021 study conflict with and further undermine Defendants' position in promulgating PGT-A that a trophectoderm biopsy at blastocyst stage can adequately predict the entire embryo and what will develop from the inner cell mass.

---

[54] Burks, C., et al., *The Technological Advances in Embryo Selection and Genetic Testing: A Look Back at the Evolution of Aneuploidy Screening and the Prospects of Non-Invasive PGT*, Reprod. Med. 2021, 2, 26-34.
[55] Coorens, et al., *Inherent mosaicism and extensive mutation of human placentas*. Nature 592, 80-85 (2021).

144.    For this reason, where the trophectoderm biopsy is taken from may alter the results
of PGT-A such that the test does not accurately predict the entire trophectoderm or the inner cell
mass, as shown in the following illustration:[56]



[56] Gleicher, N., et al., *Preimplantation Genetic Testing for Aneuploid – a Castle built on sand*.
Trends in Molecular Medicine, Opinion I Special Issue: Reproductive and Sexual Health, Vol. 27,
Issue 8, pp 731-742 (August 2021).

145.    In March 2022, an opinion based upon a review of the recent scientific literature was published in Human Reproduction, urging that PGT-A be restricted to only research protocols.[57]

146.    Also in 2022, a retrospective cohort study was published comparing cumulative live birth rates between embryo transfers with or without PGT-A.[58] The authors noted that an improvement in cumulative live birth rates with PGT-A utilization, calculated per cycle start, cannot be assumed because simply testing embryos for aneuploidy does not increase the number of euploid embryos, nor does it decrease the number of aneuploid embryos.[59]

147.    The authors concluded that there is no clear improvement to cumulative live birth rates with PGT-A. In fact, "amongst the youngest patients (age <35), not only does there appear to be no benefit to PGT-A, but there appears to be a considerable reduction in cumulative live birth rates per cycle start."[60]

148.    The authors further recognized calls for reevaluation or even repeal of widespread PGT-A usage and concluded with an advocation for "responsible innovation supported by high-quality data, which is not the case for PGT-A."[61]

149.    Defendants, however, continued to advertise and market PGT-A based upon live birth rates per embryo transfer thereby excluding from analysis any IVF cycles without transferable embryos. As a result, Defendants artificially and materially inflated and

---

[57] Gleicher, N., et al., *We have reached a dead end for preimplantation genetic testing for aneuploidy*, Human Reproduction, Vol. 37, No. 12, pp. 273002734 (2022).
[58] Kucherov, A., et al., *PGT-A is associated with reduced cumulative live birth rate in first reported IVF stimulation cycles age ≤; an analysis of 133,494 autologous cycles reported by SART CORS*, Journal of Assisted Reproduction and Genetics (2023) 40:137-149.
[59] *Id.*
[60] *Id.*
[61] *Id.*

misrepresented the utility of PGT-A on increasing the chance of pregnancy, increasing live birth rates, and increasing the chance of implantation.

150.    Another article published in Human Genomics called for regulatory oversight, recognizing that PGT-A had regrettably become a routine add-on for IVF to improve clinical outcomes, and noted the following:

    a.    There are significant knowledge gaps in PGT-A;

    b.    PGT-A is a screening tool, not a diagnostic test;

    c.    Mosaicism is much higher in the blastocyst stage from PGT-A than recognized by industry;

    d.    Mosaic embryos may not accurately represent future fetal viability;

    e.    PGT-A has not been validated;

    f.    High false positive rates are extremely concerning;

    g.    Use in particular age groups is uncertain;

    h.    Routine use of PGT-A should not be recommended;

    i.    Evidence-based data are needed to evaluate the risks and benefits for patients; and

    j.    Industry self-regulation has shown to be insufficient.[62]

151.    As further proof of the concern raised by the authors in Human Genomics regarding the high false positive rates, a re-biopsy and repeat of PGT-A testing on fifty-eight embryos that were originally determined to be chaotically abnormal concluded that twenty-two of the embryos had a euploid result.[63]

---

[62] Yang, H., et al., *Preimplantation genetic testing for aneuploidy: challenges in clinical practice*, Human Genomics (2022)16.69.
[63] Rabkina, L., et al., *Concordance of Chromosomes Within Re-Biopsy Samples of Embryos Following Initial Chaotic Results.* Fertility and Sterility, Vol. 118, Issue 4. October 2022.

152.    The researchers noted that the euploid rate suggested that chaotic abnormal results on PGT-A have "reduced predictive value."[64]

153.    These findings were further supported a year later when researchers re-biopsied sixty-four embryos reported as "chaotic", which they defined as an embryo with a PGT-A result of more than six chromosome aneuploidies and found concordance of only 67%.[65]

154.    Then in April 2023, Dr. Robert Casper determined that when the research data utilized all IVF cycles, and not just the ones where there was a transferrable embryo following PGT-A, there was actually a threefold increase in live birth rates for the group that did not have PGT-A testing performed, and a reduction in live birth rates for the group where PGT-A was utilized.[66]

155.    Based upon his findings, Dr. Casper raised concerns that PGT-A caused irreparable harm to patients with diminished ovary reserve who lost their only chance to have a baby from their cycle of IVF.[67]

156.    The European Society of Human Reproduction and Embryology ("ESHRE") add-ons working group released its good practice recommendations on add-ons in reproductive medicine in September of 2023 in which it was determined that PGT-A was not currently recommended for routine clinical use.[68]

---

[64] *Id.*
[65] Lim, Joshua, et al., *Corcordance of Repeat Biopsy Results Among Embryos with 6 or More Aneuploidies*. Fertility and Sterility. Vol. 120, Issue 4. October 2023.
[66] Casper, R. *PGT-A in patients with a single blastocyst.* Journal of Assisted Reproduction and Genetics, v. 40, p. 1227 (2023).
[67] *Id.*
[68] Lundin, K., et al., *Good Practice Recommendations on Add-Ons in Reproductive Medicine*. Human Reproduction. Vol, 38, Issue 11. November 2023.

157.    In support of this recommendation, ESHRE noted that random control test studies did not report benefits on live birth rates and caused disposal of viable embryos.

158.    Then in October 2023, it was recognized in the scientific literature that "there is currently insufficient evidence to prove the effectiveness of PGT-A in patients with unexplained recurrent implantation failure."[69]

159.    Patients with unexplained recurrent implantation failure are precisely the type of vulnerable and unsuspecting consumers that Defendants is targeting and marketing to with its misleading statements that PGT-A reduces miscarriage rates and increases the chances of a live birth.

160.    The authors of the October 2023 retrospective cohort study noted:

a.    The ineffectiveness of PGT-A may be due to the high mosaicism and unavoidable false-positive results from trophectoderm biopsies, "which led to much waste of viable embryos";

b.    The effectiveness of PGT-A in ≥38-year-old group is significantly undermined by low egg retrieval, high aneuploidy and mosaicism rate, resulting in a lot of women with no embryos to transfer;

c.    Trials targeting older women found no improvement in the cumulative live birth rate after PGT-A.[70]

161.    Again, researchers determined that high quality randomized clinical trials are needed to find patients with indications that would benefit from PGT-A.

162.    Defendants have not conducted such studies. Notably, its researchers stated that a limitation of their 2018 study "demonstrating the value of the company's

---

[69] Lui, Y., et al., *Preimplantation Genetic Testing for Aneuploidy Could Not Improve Cumulative Live Birth Rate Among 705 Couples with Unexplained Recurrent Implantation Failure*, The Application of Clinical Genetics 2024:17 1-13.
[70] *Id.*

Spectrum® preimplantation genetic screening for aneuploidy (PGT-A)" was that it was not randomized.[71]

163.    Instead, Defendants have continued to falsely and misleadingly sell the purported benefits of PGT-A as described herein without a valid and proven scientific basis to do so.

164.    In November 2023, ASRM again stated emphatically and clearly that *the "value of preimplantation genetic testing for aneuploidy (PGT-A) as a universal screening test for all patients undergoing in vitro fertilization (IVF) has not been established*." (emphasis added).[72]

165.    Defendants have omitted to include this material fact in its sale of PGT-A testing.

166.    ASRM further noted that two randomized controlled trials have been conducted which showed no benefit of PGT-A in improving live birth rates, particularly in women less than 38 years of age.[73]

167.    An article published in March of 2024 noted that it was imperative to acknowledge the inherent risks associated with PGT-A, including the potential for misdiagnosis and the risk of embryo damage during biopsy.[74]

168.    In support of the importance of acknowledging the risks associated with PGT-A, the authors cited to the Human Fertilisation & Embryology Authority ("HFEA"), which is the

---

[71] Simon, A., et.al., *Pregnancy outcomes from more than 1,800 in vitro fertilization cycles with the use of 24-chromosome single-nucleotide polymorphism-based preimplantation genetic testing for aneuploidy.* Fertility and Sterility. Vol. 110, Issue 1. July 2018.
[72] Practice Committee of the American Society for Reproductive Medicine and the Genetic Counseling Professional Group. *Clinical management of mosaic results from preimplantation genetic testing for aneuploidy of blastocysts: a committee opinion*. Fertility and Sterility. Vol. 120, No. 5. November 2023.
[73] *Id.*
[74] Gudapati, S. *Advancements and Applications of Preimplantation Genetic Testing in In Vitro Fertilization: A Comprehensive Review*. Cureus 16(3): e57357, doi: 10.7759/cureus.57357. March 2024.

United Kingdom's government's independent regulator of fertility treatment and research involving human embryos.[75]

169.    The HFEA states that there is limited evidence to show that PGT-A improves the chances of having a baby for women over 37, individuals with a history of or chromosomal problems, and those with several miscarriages or failed IVF attempts.[76]

170.    For this reason, the HFEA cautions that "Until larger trials have been run and we have more evidence, there's no guarantee that PGT-A can improve your chances of a successful pregnancy."[77]

171.    Further, the HFEA cautions that PGT-A can cause damage to the embryo thereby preventing it from developing once transferred to the womb, and that PGT-A has the possibility of misdiagnosis.[78]

172.    In looking at the evidence for PGT-A, the HFEA also noted the following:

a.    There is no evidence from randomized controlled trials that PGT-A carried out at the blastocyst stage on day 5 or 6 is effective at improving your chances of having a baby for most patients undergoing IVF.

b.    PGT-A may decrease the chance of having a baby as it often reduces the number of embryos available for transfer.

c.    Although current PGT-A techniques are mostly very accurate, the test may give the wrong result.

d.    If a test result is not accurate, healthy embryos may be discarded.

---

[75] *Id.*
[76]    https://www.hfea.gov.uk/treatments/explore-all-treatments/frequently-asked-questions-about-pre-implantation-genetic-testing-for-aneuploidy-pgt-a/ (last visited February 19, 2025).
[77] *Id.*
[78] *Id.*

e.    Embryos can continue to develop successfully after a few cells have been removed, however, removing cells from the embryo may damage it and prevent it from successfully developing.[79]

173.    Further research conducted in 2024 supported HFEA's position that PGT-A testing may give the wrong result. A re-biopsy and PGT-A testing of 69 embryos previously determined as abnormal with a result of more than five abnormal chromosomes revealed that 24.6 percent of those embryos were in fact euploid or "normal".[80]

174.    In addition, a review of 552 pregnancies of mosaic embryo transfers found that only 7 of the 552 pregnancies revealed the mosaicism that had been detected in the PGT-A testing.[81]

175.    This agreed with prior studies where prenatal testing determined that the pregnancy did not have the same mosaic result as the PGT-A testing.

176.    In 2021, research revealed no instances of mosaicism in pregnancies or newborns born from 282 embryos deemed "low-grade mosaic", and 131 embryos deemed "medium-grade mosaic" by PGT-A testing.[82]

177.    Also in 2023, prenatal testing determined that out of 250 pregnancies, only 3 had the same mosaic abnormality as the PGT-A testing result.[83]

---

[79]    https://www.hfea.gov.uk/treatments/treatment-add-ons/pre-implantation-genetic-testing-for-aneuploidy-pgt-a/ (last visited February 19, 2025).

[80]    Bago, A., et al., *Chaotic blastocysts in preimplantation genetic testing for aneuploidies: prevalence, characterization and re-biopsy results.* Human Reproduction, Vol. 39, Issue Supplement_1. July 2024.

[81]    Spinella, F, et al., *Chromosomal, gestational, and neonatal outcomes of mosaic embryos: analysis of 3074 cases from the international registry of mosaic embryo*, Human Reproduction, Volume 39, Issue Supplement_1. July 2024

[82]    Capalbo, A., et al., *Mosaic human preimplantation embryos and their developmental potential in a prospective, non-selection clinical trial.* Am. J. Hum. Genet. Vol. 108, Issue 2. December 2021.

[83]    Viotti, M, et al., *Chromosomal, gestational, and neonatal outcomes of embryos classified as a mosaic by preimplantation genetic testing for aneuploidy.* Fertility and Sterility. Vol. 120, Issue 5. November 2023.

178.    In 2024, researchers determined that nearly all blastocyst and fetal tissue contain some level of mosaicism.[84]

179.    In 2024, ASRM and SART issued another committee opinion to replace their prior committee opinion of the same name published in 2018 and discussed above. ASRM and SART reiterated that the value of PGT-A as a universal screening test for all patients undergoing IVF had not been demonstrated.[85]

180.    ASRM further noted that two recent, multicenter, randomized control trials concluded that overall pregnancy outcomes in frozen embryo transfers were similar between conventional IVF and PGT-A.[86]

181.    Defendants omitted to include these material facts in its sale of PGT-A.

182.    ASRM stated that the value of PGT-A to lower the risk of clinical miscarriage was unclear and raised concerns about the studies and trials performed. ASRM cautioned that large, prospective, well-controlled studies in a more inclusive patient population are needed.[87]

183.    ASRM concluded, as it had in 2018, that PGT-A in all infertile patients undergoing IVF cannot be recommended.[88]

184.    Still, Defendants continue to promote widespread use of PGT-A to its patients.

185.    Following the 2024 committee opinion by ASRM and SART, researchers re-examined the PGT-A results of embryos that were determined to be abnormal by PGT-A testing

---

[84]Zhai, F., et.al., Human Embryos Harbor Complex Mosaicism With Broad Presence of Aneuploid Cells During Early Development. Cell Discovery 10, 98. (September 2024) https://doi.org/10.1038/s41421-024-00719-3.

[85] Practice Committee of the American Society for Reproductive Medicine and the Society for Assisted Reproductive Technology, *The use of preimplantation genetic testing for aneuploidy: a committee opinion.* Fertility and Sterility. Vol. 122, Issue 3. September 2024.

[86] *Id.*

[87] *Id.*

[88] *Id.*

and again found a low rate of concordance between the initial PGT-A testing result and PGT-A testing result of the re-biopsy.[89]

186.    Specifically, the researchers found that the re-biopsy was concordant with only 47.7% of the PGT-A testing results. They also found that 15.8% of the re-biopsies revealed a partially concordant result and 36.8% revealed totally discordant results.[90]

187.    Despite the lack of supporting research and scientific basis as well as the recommendations of ASRM and SART, Defendants have continued to aggressively market and promote PGT-A as having benefits and properties that it does not have and has omitted the disclosure of material and relevant information to consumers.

188.    Despite the lack of supporting research and scientific basis as well as the recommendations of ASRM and SART, Defendants have continued to aggressively market and promote PGT-A as having benefits and properties that it does not have and has omitted the disclosure of material and relevant information to consumers.

189.    As of 2025, there have been no randomized, properly structured, non-commercial trials to support the basis of Defendants' sale of PGT-A.

190.    There are only two non-selection studies showing the efficacy and accuracy of PGT-A.

191.    The first was performed on single nucleotide polymorphism microarray-based PGT-A, which is not the same PGT-A assay utilized by Defendants.[91]

---

[89] Tikhonov, A., et al., *Re-Examination of PGT-A Detected Genetic Pathology in Compartments of Human Blastocysts: A Series of 23 Cases*. Journal of Clinical Medicine. 2024; 13(11):3289. https://doi.org/10.3390/jcm13113289.
[90] *Id.*
[91] Scott Jr., R.T., et.al., *Comprehensive chromosome screening is highly predictive of the reproductive potential of human embryos: a prospective, blinded, nonselection study*. Fertility and Sterility, Vol. 97, Issue 1. April 2012).

192.    The second was performed on next-generation sequencing PGT-A but noted that the results were only to be applied to that targeted PGT-A assay, which differs from the one utilized by Defendant, and that validation needs to be performed on each assay.[92]

193.    Plaintiffs and Class members have relied on Defendants' material misstatements and omissions to their detriment by purchasing an expensive test that they would not have purchased if the facts had been disclosed at the time of sale.

**C.    Defendants Have Utilized False And Misleading Statements To Increase Sales Of PGT-A**

194.    As a result of Defendants' aggressive advertising and marketing, PGT-A testing is now purchased by consumers as an add-on in an estimated 40% of IVF cycles in the United States.

195.    Despite the increase in PGT-A testing use, live birth rates among individuals undergoing IVF have declined.

196.    Defendants' false and misleading statements concerning its PGT-A testing, which they also call CCS, include, without limitation, the following:

a.    Defendants' PGT-A testing has some of the highest success rates in the nation;

b.    Defendants' PGT-A testing significantly reduces the risk of miscarriage (less than 5%);

c.    Defendants' PGT-A testing increases live birth rates;

d.    Defendants' PGT-A testing increases the chance of pregnancy;

---

[92] Tiegs, A.W., et.al., *A multicenter, prospective, blinded, nonselection study evaluating the predictive value of an aneuploid diagnosis using a targeted next-generation sequencing–based preimplantation genetic testing for aneuploidy assay and impact of biopsy.* Fertility and Sterility, Vol. 115, Issue 3. March 2021.

e.  Defendants' PGT-A testing delivers the highest rate of chromosomally normal embryos for patients;

f.  Defendants' PGT-A testing reports the lowest chromosomal mosaicism rates in the United States;

g.  Defendants' PGT-A testing provides the fastest path to a successful live birth; and

h.  Defendants' PGT-A testing is 95-98% accurate.

197.    Further, in making the above statements, Defendants have concealed and omitted material information from consumers, including, without limitation:

a.  By failing to disclose an accurate assessment of the state of scientific study and knowledge concerning PGT-A, of which Defendants is aware;

b.  By failing to disclose that the value of PGT-A as a screening test for all IVF patients has not been demonstrated by science;

c.  By failing to have the above statements supported by properly designed research studies;

d.  By failing to tell consumers that PGT-A is experimental;

e.  By failing to tell consumers that PGT-A is unproven;

f.  By failing to tell consumers that PGT-A results have a substantial degree of inaccuracy; and

g.  By failing to tell consumers that PGT-A has a substantial degree of unreliability.

198.    Defendants' false and misleading advertising and marketing statements, which include the following, have played a key role in driving up the use of PGT-A testing in the United States.

1.    **Defendants Falsely State That Their PGT-A Testing Has Some Of The Highest Success Rates In the Nation.**

199.    Defendants claim that their PGT-A testing has some of the highest success rates in the nation.[93]

## CCRM PGT-A success rates are some of the highest in the nation

200.    Defendants know this statement is misleading to consumers as there is no valid and scientifically supportable evidence to show that PGT-A improves the success of IVF.

201.    Research has found no benefit for PGT-A regardless of age on cumulative live-birth rate.[94]

202.    Further, ASRM has repeatedly noted that trials concluded that overall pregnancy outcomes in frozen embryo transfers were similar between conventional IVF and PGT-A.[95]

203.    In addition, there is no evidence that Defendants' PGT-A is more successful than others.

204.    Defendants claim on their website that they have extensively validated their testing platform and that it is at the highest level of expertise.[96]

---

[93] https://www.ccrmivf.com/genetics/ (last visited April 2, 2025)
[94] Yan, J., et al., *Live Birth with or without Preimplantation Genetic Testing for Aneuploidy*, N. Engl. J. Med. 385;22, November 25, 2021.
[95] Practice Committee of the American Society for Reproductive Medicine and the Genetic Counseling Professional Group. *Clinical management of mosaic results from preimplantation genetic testing for aneuploidy of blastocysts: a committee opinion.* Fertility and Sterility. Vol. 120, No. 5. November 2023.
[96] https://www.ccrmivf.com/services/comprehensive-chromosome-screening-ccs/ (last visited April 2, 2025)

**NEXT-GENERATION SEQUENCING (NGS)**

Next-generation sequencing is the latest technological breakthrough in pre-implantation genetic testing. NGS allows us to study all 23 pairs of chromosomes at a more comprehensive level and with deeper resolution. CCRM's CCS lab extensively validated the accuracy, reproducibility and reliability of this revolutionary new CCS NGS platform (VeriSeq™ by Illumina).

 CCRM is aware that there are other IVF clinics and reference labs publicly reporting discrepancy with aneuploid embryos (chromosomally abnormal). We want to assure our patients that our CCS lab runs at the highest level of expertise with strict quality control and data analysis to enable accurate CCS diagnosis of IVF embryos. As part of our ongoing commitment to excellence, we routinely reconfirm diagnosis on aneuploid embryos to better understand the incidence of chromosome abnormality. CCRM has biopsied over 60,000 embryos with only 2.3% returning with evidence of presumptive mosaicism. CCRM delivers the highest rates of chromosomally normal embryos for our infertility patients.

205.    However, the only non-selection study performed on next-generation sequencing PGT-A was on a testing assay which differs from the one utilized by Defendant, and that validation needs to be performed on each assay.[97]

206.    Thus, Defendants' assay has never been properly validated to determine whether its PGT-A testing is more successful than others.

### 2. Defendants Falsely State That Their PGT-A Significantly Reduces The Risk of Miscarriage (Less Than 5%)

207.    The genetics section of Defendants' website proclaims that their PGT-A testing has a significant reduced risk of miscarriage, less than 5%.[98]

---

[97] Tiegs, A.W., et.al., *A multicenter, prospective, blinded, nonselection study evaluating the predictive value of an aneuploid diagnosis using a targeted next-generation sequencing–based preimplantation genetic testing for aneuploidy assay and impact of biopsy.* Fertility and Sterility, Vol. 115, Issue 3. March 2021.

[98] https://www.ccrmivf.com/genetics/ (last visited April 2, 2025).

> a significant reduced risk of miscarriage (less than 5%)

208. Defendants know these statements are false, deceptive, and misleading to consumers considering the scientific research set forth above as there is no valid evidence to show that PGT-A decreases the chance of miscarriage.

209. A randomized controlled trial to evaluate the benefit of PGT-A for embryo selection in frozen-thawed embryo transfer found that PGT-A did not reduce miscarriage rates.[99]

210. There is no valid scientific proof for Defendants' claim that its PGT-A reduces miscarriage to less than 5%.

### 3. Defendants Falsely State That Their PGT-A Increases Live Birth Rates

211. To sell their PGT-A testing, Defendants also falsely and misleadingly claim that their PGT-A increases live birth rate.[100]

> including a significant reduced risk of miscarriage (less than 5%) and increased live birth rates. Through CCRM Fertility's efforts, more than 5,000 healthy babies have been born following the transfer of embryos with the correct number of chromosomes.

212. In 2022, a retrospective cohort study concluded that there is no clear improvement to cumulative live birth rates with PGT-A.[101]

---

[99] Munne, S., et al., *Preimplantation genetic testing for aneuploidy versus morphology as selection criteria for single frozen-thawed embryo transfer in good-prognosis patients: a multicenter randomized clinical trial*. Fertility and Sterility, Vol. 112, No. 6, December 2019.

[100] https://www.ccrmivf.com/genetics/ (last visited April 2, 2025).

[101] Kucherov, A. et al. *PGT-A is associated with reduced cumulative live birth rate in first reported IVF stimulation cycles age ≤; an analysis of 133,494 autologous cycles reported by SART CORS*, Journal of Assisted Reproduction and Genetics (2023) 40:137-149.

213.    The authors further recognized calls for reevaluation or even repeal of widespread
PGT-A usage and concluded with an advocation for "responsible innovation supported by high-
quality data, which is not the case for PGT-A."[102]

214.    Defendant's false and misleading statements promoting the use of PGT-A are also
in direct contradiction to the ASRM which has concluded that PGT-A has showed no improvement
in live birth rates.[103]

215.    In fact, research in 2016 had already shown that PGT-A decreased live birth rates
when compared to IVF without testing.[104]

**4.    Defendants Falsely State That Their PGT-A Testing Increases The Chance of Pregnancy**

216.    In their marketing materials, Defendants falsely and misleading claim their PGT-A
testing increases the chance of successful pregnancy.[105]

If you have questions about CCS and
how it could increase your chances of a successful
pregnancy, please speak with a CCRM doctor.

---

[102] *Id.*

[103] Practice Committee of the American Society for Reproductive Medicine and the Genetic
Counseling Professional Group. *Clinical management of mosaic results from preimplantation
genetic testing for aneuploidy of blastocysts: a committee opinion.* Fertility and Sterility. Vol.
120, No. 5. November 2023.

[104] Kushnir, VA, et al., *Effectiveness of in vitro fertilization with preimplantation genetic
screening: a reanalysis of Unites States assisted reproductive technology data 2011-2012.* Fert
Steril, 2016; 106(1): 75-9

[105] Where to Begin CCRM video, https://www.youtube.com/watch?v=VCG4DXALLYg (last
visited April 2, 2025).

217.    On their PGT-A testing results, Defendants also state that PGT-A is "offered to increase the chance of establishing a clinical pregnancy."[106]

218.    No valid scientific research, however, has concluded this to be accurate.

219.    In fact, ASRM has repeatedly noted that trials concluded that overall pregnancy outcomes in frozen embryo transfers were similar between conventional IVF and PGT-A.[107]

### 5.    Defendants Falsely State That Their PGT-A Testing Delivers The Highest Rate Of Chromosomally Normal Embryos For Patients

220.    Defendants misleads consumers by stating that their PGT-A testing reports some of the highest euploid rates and results in more euploid embryos for their patients.[108]

- At CCRM, we report some of the highest euploid rates in the world resulting in more euploid embryos for our patients.

221.    Defendants are well-aware that they are advertising, marketing, and selling their product to vulnerable consumers undergoing IVF, however, Defendants have utilized this false, deceptive, and misleading claim to sell their testing.

222.    Research has proven that trophectoderm biopsy cannot predict the inner cell mass.[109]

---

[106] CCRM Blastocyst Chromosome Results Report issued to Plaintiff Randi Maves.

[107] Practice Committee of the American Society for Reproductive Medicine and the Genetic Counseling Professional Group. *Clinical management of mosaic results from preimplantation genetic testing for aneuploidy of blastocysts: a committee opinion.* Fertility and Sterility. Vol. 120, No. 5. November 2023.

[108] About CCS at CCRM video, https://www.youtube.com/watch?v=KcKaKbc70yE (last visited April 3, 2025).

[109] Gleicher, N., et al., *Preimplantation Genetic Testing for Aneuploid – a Castle built on sand.* Trends in Molecular Medicine, Opinion I Special Issue: Reproductive and Sexual Health, Vol. 27, Issue 8, pp 731-742 (August 2021). *See also* Xu, Jian, et.al., *Biopsy vs comprehensive*

223.    Further, research has determined that PGT-A does not change the embryo.[110]

224.    Therefore, it is impossible for Defendants' PGT-A testing to result in more euploid embryos.

### 6. Defendants Falsely State That Their PGT-A Testing Reports The Lowest Chromosomal Mosaicism Rates in the United States

225.    Defendants are advertising, marketing, and selling their product to vulnerable consumers pursuing IVF by misleadingly claiming that less then 3% of embryos tested by their PGT-A testing are mosaic.



226.    As outlined above, PGT-A does not change the embryo.[111] In other words, an embryo will be euploid or aneuploid regardless of whether it undergoes PGT-A. PGT-A only purports to test for whether an embryo is normal or abnormal.

---

*embryo/blastocyst analysis: a closer look at embryonic chromosome evaluation.* Human Reproduction Open. Volume 2025, Issue 2 (March 2025).
[110] Lamb, B., et al., *Pre-implantation genetic testing: decisional factors to accept or decline among in vitro fertilization patient*. Journal of Assisted Reproduction and Genetics, Vol. 35, pp. 1605- 1612 (2018) 37-669-672
[111] Lamb, B., et al., *Pre-implantation genetic testing: decisional factors to accept or decline among in vitro fertilization patient*. Journal of Assisted Reproduction and Genetics, Vol. 35, pp. 1605- 1612 (2018) 37-669-672

227.    Therefore, it is impossible for Defendants' PGT-A testing to report the lowest mosaicism rates in the United States because their testing does not alter the embryos themselves.

228.    Further, research has determined that nearly all blastocysts and fetal tissue contain some mosaicism, making it scientifically impossible for Defendants' testing to report the lowest mosaicism rates.[112]

229.    Finally, the only comparison of PGT-A results between laboratories that has been conducted was of 4 national laboratories in 2023.[113]

230.    The comparison revealed statistical significance in findings of euploid, mosaicism and aneuploid rates between the 4 laboratories but did not reveal which laboratories had been included in the study.[114] Thus, it is unknown whether Defendants' PGT-A testing was included.

231.    However, if it was, the study found that the lab that reported the lowest mosaicism rate in fact had the highest aneuploid rate, which would make Defendants' claim that their PGT-A reports the highest euploid rates demonstrably false.[115]

### 7.  Defendants Falsely State That Their PGT-A Testing Provides The Fastest Path To A Successful Live Birth

232.    In marketing materials, Defendants falsely and misleadingly sell their PGT-A testing as the fastest path to a successful live birth.[116]

---

[112] Zhai, F., et.al., *Human Embryos Harbor Complex Mosaicism With Broad Presence of Aneuploid Cells During Early Development.* Cell Discovery 10, 98. (September 2024) https://doi.org/10.1038/s41421-024-00719-3.

[113] Bardos, J., et.al. *Reproductive genetics laboratory may impact euploid blastocyst and live birth rates: A comparison of 4 national laboratories' PGT-A results from vitrified donor oocytes.* Fert. Ster. 119(1) pp. 23-35 (Ja.n 2023).

[114] *Id.*

[115] *Id.*

[116] Where To Begin CCRM video, https://www.youtube.com/watch?v=VCG4DXALLYg (last visited April 2, 2025).



## CCRM is a pioneer in the development and use of CCS.

We were the first IVF clinic worldwide to test 23 pairs of chromosomes at
the blastocyst stage and transfer only euploid embryos.

Only using chromosomally normal embryos is the fastest path to a successful
live birth and decreases your chance of miscarriage.

Since 2007, more than 10,000 chromosomally normal babies have been born as a result of CCS at CCRM.

233.    Defendants further state that their PGT-A provides faster turnaround and added cost effectiveness.[117]

As pioneers of blastocyst CCS, the team at CCRM has implemented technology changes over the years allowing for developments in the laboratory to be tested and transferred into clinical practice. These have provided fantastic benefits to patients including faster turnaround time for results, a deeper look at embryonic chromosomes and added cost effectiveness.

234.    There is no valid scientific research to support these false and misleading statements, and in fact, research shows that utilizing PGT-A does not decrease time to pregnancy.[118]

---

[117] https://www.ccrmivf.com/genetics/ (last visited April 2, 2025).
[118] Palmer, M., et al., *Preimplantation Genetic Testing For Aneuploidy and Time to Pregnanc*y. Fertility and Sterility. Vol. 114, Issue 3. September 2020

### 8. Defendants Falsely State That Their PGT-A Testing Is 95-98% Accurate.

235.    The consent form provided by Defendants to all patients states that PGT-A may give the wrong result, but that accuracy is determined by the off-site lab and most testing is "very, very accurate, so the chance of misdiagnosis is low."[119]

• Misdiagnosis. The test may give the wrong result, and say that a normal embryo is actually abnormal, or that an abnormal embryo is actually normal. The accuracy of testing is determined by the off-site lab. Most testing is very, very accurate, so the chance of misdiagnosis is low. Furthermore, since not all embryos are made up of cells with identical genetics ("mosaicism"), it is possible that accurate test result does not reflect the genetics of the entire embryo. Consequently, the current recommendation is to confirm the result in early pregnancy.

236.    More specifically, Defendants' Blastocyst Chromosome Results Report provided to all consumers who purchase their PGT-A testing states that the accuracy rate of the test is 95-98%.[120]

237.    Not only do Defendants fail to provide support for their assertions, but the assertions are belied by the scientific literature which has found concordance rates of reanalysis with original PGT-A results as 93.8% for euploid results, 81.4% for aneuploid results and 42.6% for mosaic aneuploid results, and also found that PGT-A is unproven, as described above.[121]

238.    Another scientific study suggested a potential false positive PGT-A rate of almost 55% and an intra-embryo discrepancy of almost 50%.[122]

---

[119] Defendants' In Vitro Fertilization Process, Risk and Benefits Form.

[120] CCRM Blastocyst Chromosome Results Report issued to Plaintiff Randi Maves.

[121] Marin, D., et al., *Preimplantation genetic testing for aneuploidy: A review of published blastocyst reanalysis concordance data.* Prenatal Diagnosis. Vol. 4, Issue 5. Pp. 545-553. April 2021.

[122] Gleicher, N., et al., *Accuracy of preimplantation genetic screening (PGS) is compromised by degree of mosaicism of huma embryos*, Reproductive Biology and Endocriniology (2016) 14:54.

### D.    Defendants' Additional Material Omissions

239.    There is no valid, independent, and properly conducted scientific research supporting that conducting a biopsy of an embryo does not harm implantation.[123]

240.    However, biopsying an embryo is a prerequisite for PGT-A testing and this material fact is not disclosed by Defendants to consumers.

241.    Further, Defendants omit to inform consumers of the fact that damage to embryos caused by biopsy may be the reason for unsuccessful IVF outcomes following PGT-A.[124]

242.    Defendants claim in their consent form that embryo biopsy and PGT-A are nearly harmless.[125]

Risks of embryo biopsy
• Damage. There is a small risk of damage to the embryo. This may result in no embryos to transfer.

243.    Defendants also misleadingly claim in their consent form that PGT-A only requires removal of as little as one cell from the embryo.[126]

Preimplantation genetic diagnosis and screening of embryos requires removal of one or more cells from the embryo (*embryo biopsy*).

244.    As detailed above, Defendants aggressively market PGT-A via misleading and unsupported statements while omitting material information from consumers prior to their purchase of PGT-A.

245.    Defendants have failed to inform consumers of the numerous scientific studies and opinions of professional organizations detailed above.

---

[123] Viville, S. and Aboulghar, M., *PGT-A: what's it for, what's wrong?* Journal of Assisted Reproduction and Genetics. January 2025.
[124] Alteri, Alessandra. *Obstetrick neonatal and child health outcomes following embryo biopsy for preimplantation genetic testing. Human Reproduction Update*, Vol,29, Issue 3. pp. 291-306 (2023).
[125] Defendants' In Vitro Fertilization Process, Risk and Benefits Form.
[126] *Id.*

246.    Defendants inform consumers that a biopsy of a few cells is taken but do not inform consumers that science shows that the inner cell mass is more effective in self-correcting than the trophectoderm from which the cells are taken.[127]

this procedure, embryos are cultured in the lab to the blastocyst stage (day 5 or 6 of embryonic development) prior to 3-6 cells being removed (biopsied) to test for chromosomal numeration.

247.    Chromosomal abnormal embryos may self-correct downstream, which renders earlier biopsy results irrelevant, but Defendants omit this from consumers.

248.    The trophectoderm – from which the placenta develops – has been known to contain aneuploid cells even in chromosomally normal pregnancies, while the fetus, arising from the inner cell mass, remains chromosomally normal.[128]

249.    Defendants omit this from consumers. Instead, Defendants misleadingly provide results to consumers as an incorrect number of chromosomes in the embryo itself and not as an incorrect number detected in the trophectoderm biopsy, which is the only portion tested with PGT-A and which may or may not properly represent the inner cell mass.[129]

**Interpretation of Results:**

An INCORRECT number of chromosomes were detected in embryo 1, 2, 5, 6, 7, 8 & 9. These embryos are considered to be at high risk for a chromosome abnormality.

[130]

250.    Because of the complexity introduced by mosaicism when testing an extremely small sample of cells that may or may not represent the whole embryo, there is a substantial

---

[127] https://www.ccrmivf.com/genetics/ (last visited April 2, 2025).
[128] Xu, Jian, et.al., *Biopsy vs comprehensive embryo/blastocyst analysis: a closer look at embryonic chromosome evaluation.* Human Reproduction Open. Volume 2025, Issue 2 (March 2025).
[129] Yan, J., et al., *Live Birth with or without Preimplantation Genetic Testing for Aneuploidy*, N. Engl. J. Med. 385;22, November 25, 2021.
[130] CCRM Blastocyst Chromosome Results Report issued to Plaintiff Randi Maves.

probability that an embryo may be misdiagnosed, and the test results inaccurate, but Defendants omit this from consumers.

251.    Further, with respect to self-correction that occurs in human embryos, Defendants fails to inform consumers that biopsy at the blastocyst stage may not accurately reflect the final chromosomal outcome of embryos.

252.    Defendants also omit to inform consumers concerning the false positives and false negatives that occur with PGT-A, and the actual rates of false positives and false negatives shown through scientific study.

253.    Scientific research has found concordance rates of reanalysis with original PGT-A results as 93.8% for euploid results, 81.4% for aneuploid results, and 42.6% for mosaic aneuploid results.[131]

254.    Another scientific study suggested a potential false positive PGT-A rate of almost 55% and an intra-embryo discrepancy of almost 50%.[132]

### E.    PGT-A Has Enriched Defendants

255.    The average cost of PGT-A is approximately $5,000 per IVF cycle and is an "add-on" expense to IVF usually not covered by insurance.

256.    The global preimplantation genetic testing market was estimated to be worth $0.7 billion in 2023 and is poised to reach $1.2 billion by 2028.

257.    The PGT-A segment is expected to dominate the global preimplantation genetic testing market within the next several years.

---

[131] Marin, D., et al., *Preimplantation genetic testing for aneuploidy: A review of published blastocyst reanalysis concordance data.* Prenatal Diagnosis. Vol. 4, Issue 5. Pp. 545-553. April 2021.
[132] Gleicher, N., et al., *Accuracy of preimplantation genetic screening (PGS) is compromised by degree of mosaicism of huma embryos*, Reproductive Biology and Endocriniology (2016) 14:54.

258.    The use of PGT-A now encompasses an estimated 40% of IVF cycles in the United States.

259.    Despite all the scientific literature concerning PGT-A set forth above, Defendants have continued to advertise and market PGT-A to consumers as having some of the highest success rates in the nation, significantly reducing the risk of miscarriage (less than 5%), increasing live birth rates, increasing the chance of pregnancy, delivering the highest rate of chromosomally normal embryos for patients, reporting the lowest chromosomal mosaicism rates in the United States, and providing the fastest path to a successful live birth. Defendants also sell their PGT-A testing as 95-98% accurate. Each of these claims are false and misleading, unsupported by scientific evidence, and made while Defendants omitted and withheld material information.

F.    **Plaintiffs' Experience With Defendants' PGT-A**

260.    Plaintiffs and Class members were harmed by paying for an unproven and unreliable test sold utilizing false statements and omissions.

261.    Plaintiffs and Class members were injured at the time of sale and would not have purchased PGT-A from Defendants had they been told the truth at the time of sale concerning the body of scientific knowledge about PGT-A and each of the misstatements and omissions detailed above. Each separate misstatement and omission by Defendants separately and independently give rise to the causes of action alleged below.

262.    Plaintiffs and Class members suffered direct economic losses as a result of their purchase of PGT-A testing from Defendants, including but not limited to the out-of-pocket payments that each paid to Defendants for their PGT-A testing as well as additional costs associated with their PGT-A testing.

263.    Plaintiffs and Class members were also harmed in that Defendants would only allow embryos with an abnormal result based upon Defendants' PGT-A testing to be a) utilized for research or b) discarded.

### 1.    Stacy Tyman's Purchase of PGT-A Testing

264.    Stacy Tyman purchased PGT-A testing from Defendants based upon Defendants' false and misleading statements, including that their PGT-A has some of the highest success rates in the nation, significantly reduces the risk of miscarriage (less than 5%), increases live birth rates, increases the chance of pregnancy, delivers the highest rate of chromosomally normal embryos for patients, reports the lowest chromosomal mosaicism rates in the United States, and provides the fastest path to a successful live birth as well as being 95-98% accurate.

265.    Plaintiff Tyman purchased Defendants' PGT-A testing, in or around March 2019, based upon Defendants' misrepresentations and omissions of material information as detailed above.

266.    Plaintiff Tyman relied upon Defendants' false and misleading misrepresentations and omissions and paid approximately $2500 plus additional costs for her PGT-A testing, which she would not have purchased absent Defendants' false and misleading misrepresentations and omissions.

### 2.    Plaintiff Sonal Keenan Bhatia's Purchase of PGT-A Testing

267.    Plaintiff Bhatia underwent IVF and purchased PGT-A testing from Defendants based upon Defendants' statements that their PGT-A has some of the highest success rates in the nation, significantly reduces the risk of miscarriage (less than 5%), increases live birth rates, increases the chance of pregnancy, delivers the highest rate of chromosomally normal embryos for

patients, reports the lowest chromosomal mosaicism rates in the United States, and provides the fastest path to a successful live birth as well as being 95-98% accurate.

268.    Plaintiff Bhatia further purchased Defendants' PGT-A testing, in or around May 2021, July 2021, and December 2021, based upon Defendants' misrepresentations and omissions of material information as detailed above.

269.    Plaintiff Bhatia relied upon Defendants' false and misleading misrepresentations and omissions and paid approximately $3,000.00 plus additional costs for her PGT-A testing which she would not have purchased absent Defendants' false and misleading misrepresentations and omissions.

### 3.    Plaintiff Randi Maves' Purchase of PGT-A Testing

270.    Plaintiff Maves underwent IVF and purchased PGT-A testing from Defendants based upon Defendants' statements that their PGT-A has some of the highest success rates in the nation, significantly reduces the risk of miscarriage (less than 5%), increases live birth rates, increases the chance of pregnancy, delivers the highest rate of chromosomally normal embryos for patients, reports the lowest chromosomal mosaicism rates in the United States, and provides the fastest path to a successful live birth as well as being 95-98% accurate.

271.    Plaintiff Maves further purchased Defendants' PGT-A testing, in or around June and December of 2023, based upon Defendants' misrepresentations and omissions of material information as detailed above.

272.    Plaintiff Maves relied upon Defendants' false and misleading misrepresentations and omissions and paid approximately $9,161 plus additional costs for her PGT-A testing which she would not have purchased absent Defendants' false and misleading misrepresentations and omissions.

## CLASS ALLEGATIONS

273.    Plaintiffs bring this lawsuit individually and, pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, for economic losses, injunctive relief, and declaratory relief on behalf of all persons in the United States who have purchased PGT-A testing from Defendants (the "Nationwide Class").

274.    In addition, Plaintiffs Tyman and Maves bring this lawsuit on behalf of a class of all residents of the State of Colorado who purchased PGT-A testing from Defendants (the "Colorado Class").

275.    In addition, Plaintiff Bhatia brings this lawsuit on behalf of a class of all residents of the State of New York who purchased PGT-A testing from Defendants (the "New York Class").

276.    The Nationwide Class and each state-wide Class defined above are referred to collectively herein as the "Class."

277.    Excluded from each Class are Defendants, its affiliates, employees, officers, and directors, and the Judge(s) assigned to this case.

278.    Plaintiffs reserve the right to modify, change, or amend the Class definitions set forth above based on discovery and further investigation.

279.    **Numerosity**. Each defined Class is so numerous that the joinder of all Class members is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts. Plaintiffs do not presently know the exact size of each Class, but this information is in Defendants' possession and will be obtained in discovery.

280.    **Common Questions Predominate**. This action involves common questions of law and fact to each Class because each member's claim derives from Defendants' false, deceptive,

and misleading statements and omissions as alleged above. Common questions of law and fact include but are not limited to:

- Defendants' misstatements and omissions to Class members regarding PGT-A;

- Whether a reasonable consumer would consider the misstatements and omissions to be material;

- Whether a reasonable consumer would be misled by Defendants' advertising and marketing regarding PGT-A;

- Whether a reasonable consumer would rely upon Defendants' misstatements and omissions concerning PGT-A;

- Defendants' knowledge of its misstatements and omissions;

- The date of Defendants' knowledge;

- Whether each of the alleged advertising misstatements described in detail above was false or misleading;

- Whether Defendants conduct violates each of the laws set forth in the causes of action below;

- Whether Plaintiffs and the Class were harmed at the point of sale by Defendants' conduct;

- Whether Defendants violated express and/or implied promises or warranties concerning the sale of PGT-A; and

- Whether Defendants were unjustly enriched as a result of its conduct.

These common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover.

281. **Typicality**. Plaintiffs' claims are typical of the claims of other Class members they seek to represent because, among other things, all such claims arise out of the same unlawful course of conduct by Defendants as alleged herein. Plaintiffs and Class members each purchased PGT-A

based on Defendants' misrepresentations and omissions and they all suffered economic damages as a result.

282.    **Adequacy of Representation**. Plaintiffs will fairly and adequately protect the interests of all Class members. Plaintiffs have no interests in conflict with the interests of Class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class. By prevailing on their own claims, Plaintiffs will establish Defendants' liability to all Class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class members and will diligently discharge those duties.

283.    **Superiority**. There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by Class members will tend to establish inconsistent standards of conduct for Defendants and result in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, an important public interest will be served by addressing the matter as a class action.

284.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

285.    **Injunctive Relief**. Class certification is also appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants acted and refused to act on grounds generally

applicable to the class, making appropriate final injunctive relief with respect to the Class as a whole.

## CAUSES OF ACTION

242.    All Nationwide Class members have a nexus with Colorado such that Colorado law should apply to all of them. In the alternative, if the Court finds that Colorado law, including all of the Colorado law causes of action alleged below, does not apply to Plaintiffs and all Class members residing outside of Colorado for any reason, then Plaintiffs and Class members residing outside of Colorado assert their claims under the laws of their respective states of residence.

**COUNT I**
**Violations of the Colorado Consumer Protection Act,**
**C.R.S. 1963: §6-1-101, *et seq.***
**(On behalf of Plaintiff Tyman,  Plaintiff Maves and the Nationwide Class)**

243.    Plaintiffs incorporate by reference all preceding allegations.

244.    Plaintiffs Tyman and Maves and Defendants are a "person" within the meaning of C.R.S. 1963: §6-1-102.

245.    Defendants are engaged in "trade" and "commerce" within the meaning of C.R.S. 1963: §6-1-105 as they promote and sell PGT-A testing for sale to consumers within the State.

246.    Defendants' representations and omissions were material to a reasonable consumer and likely to affect consumer decisions and conduct.

247.    Defendants used and employed deceptive and unfair methods of competition and unfair or deceptive acts, practices, and or representations in the conduct of trade or commerce.

248.    Defendants' acts and practices offend public policy as established by statute. Defendants' acts and practices violate the Federal Trade Commission Act, which provides that "unfair or deceptive acts or practices in or affecting commerce . . . are . . . declared unlawful." 15 U.S.C. Sec. 45(a)(1).  An act or practice is "unfair" if it "causes or is likely to cause substantial

injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

249.    Defendants' acts and practices as detailed herein violate C.R.S. 1963: §6-1-105 1(b), (c), (e), (g), (i), (u), (ee), and (rrr), among others.

250.    Defendants' acts and practices are fraudulent, willful, knowing, or intentional, immoral, unethical, oppressive, and unscrupulous.

251.    Defendants' conduct is substantially injurious to consumers. Such conduct has, and continues to cause, substantial economic injury to consumers because consumers would not have paid for Defendants' PGT-A testing and other related costs but for Defendants' false and misleading statements, omissions, and promotion.

252.    Consumers have thus paid unnecessarily for testing and such injury is not outweighed by any countervailing benefits to consumers or competition.

253.    No benefit to consumers or competition results from Defendants' conduct. Since consumers reasonably rely on Defendants' representations and omissions, consumers could not have reasonably avoided such injury.

254.    The foregoing unfair and deceptive practices directly, foreseeably, and proximately caused Plaintiffs and the Colorado Class to suffer an ascertainable loss when they paid for PGT-A testing based on Defendants' false and misleading material statements and omissions.

255.    Plaintiffs and the Colorado Class are entitled to recover damages and other appropriate relief pursuant to C.R.S. 1963: §6-1-113.

## Count II
### Violations of New York Consumer Protection GBL § 349, *et seq.*
### (On behalf of Plaintiff Bhatia and the New York Class)

256.    Plaintiffs incorporate by reference all preceding allegations.

56

257.    New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state…".

258.    Defendants' conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiffs and the New York Class members seek monetary damages and the entry of preliminary and permanent injunctive relief against Defendants, enjoining them from inaccurately, misleadingly, or deceptively describing, marketing, and promoting PGT-A testing to consumers as alleged herein.

259.    Defendants have marketed, promoted, and sold PGT-A to consumers in New York and received substantial revenue in New York for doing so.

260.    Defendants' improper consumer-oriented conduct includes, but is not limited to, the following false and/or deceptive assurances:

   a.    Defendants' PGT-A testing has some of the highest success rates in the nation;

   b.    Defendants' PGT-A testing significantly reduces the risk of miscarriage (less than 5%);

   c.    Defendants' PGT-A testing increases live birth rates;

   d.    Defendants' PGT-A testing increases the chance of pregnancy;

   e.    Defendants' PGT-A testing delivers the highest rate of chromosomally normal embryos for patients;

   f.    Defendants' PGT-A testing reports the lowest chromosomal mosaicism rates in the United States;

   g.    Defendants' PGT-A testing provides the fastest path to a successful live birth;

   h.    Defendants' PGT-A testing is 95-98% accurate; and

i.   The additional misstatements and omissions alleged herein.

261.   Defendants' improper consumer-oriented conduct is misleading in a material way and induced Plaintiff and the New York Class to purchase PGT-A from Defendants when they otherwise would not have. Defendants made their misleading representations and omissions willfully, wantonly, and with reckless disregard for the truth.

262.   Defendants further breached their duties to Plaintiffs as follows, without limitation:

a.   By failing to provide an accurate assessment of the state of scientific study and knowledge concerning PGT-A;

b.   By failing to disclose that the value of PGT-A as a screening test for IVF patients has not been demonstrated by science;

c.   By failing to have the above statements supported by properly designed research studies;

d.   By failing to tell consumers that PGT-A is experimental;

e.   By failing to tell consumers that PGT-A is unproven;

f.   By failing to tell consumers that PGT-A results have a substantial degree of inaccuracy; and

g.   By failing to tell consumers that PGT-A has a substantial degree of unreliability.

263.   Plaintiff and the New York Class Members and all consumers nationwide have been injured because they paid for PGT-A sold by Defendants (and related costs) that they reasonably believed was accurate and reliable based on Defendants' misrepresentations and omissions as alleged herein. Accordingly, Plaintiff and the New York Class members incurred economic losses purchasing  PGT-A that did not perform as advertised and did not have the qualities that were represented.

264.   Defendants' advertising, marketing, and promotion of PGT-A induced Plaintiff and the New York Class to buy Defendants' PGT-A.

265.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law § 349(a), and Plaintiff and the New York Class have been damaged by these practices.

266.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Class members are entitled to monetary, compensatory, treble, statutory, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT III**
**Violations of New York Consumer Protection GBL § 350**
**(On behalf of Plaintiff Bhatia and the New York Class)**

267.    Plaintiffs incorporate by reference all preceding allegations.

268.    N.Y. Gen. Bus. Law § 350 provides, in part, as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

269.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect.  In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, ***but also the extent to which the advertising fails to reveal facts material in the light of such representations*** with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

*Id*. (emphasis added).

270.    Defendants' marketing and advertising contain untrue and materially misleading statements and omissions concerning the accuracy, reliability, and science supporting its PGT-A.

271.    Plaintiffs and the New York Class have been injured as they relied upon Defendants' misleading and deceptive advertising and marketing of PGT-A.

272.    Defendants' advertising, marketing, and promotion induced Plaintiffs and the New York Class members to PGT-A.

273.    Defendants made untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

274.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

275.    Defendants made the material misrepresentations described in this Complaint in Defendants' advertising, marketing, and other promotional materials.

276.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing PGT-A continue to be exposed to Defendants' material misrepresentations and omissions which remain to this day on their advertising, marketing, and promotional materials.

277.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and the New York Class members are entitled to monetary, compensatory, treble, statutory, and punitive damages, injunctive relief, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

### COUNT IV
**Breach of the Implied Warranty of Merchantability
(On behalf of Plaintiffs and the Nationwide Class)**

292.    Plaintiffs incorporate by reference all preceding allegations.

293. By operation of law, Defendants, as the provider and seller of its PGT-A testing, impliedly warranted to Plaintiffs and the Nationwide Class members that Defendants' PGT-A was of merchantable quality and fit for its ordinary and intended use.

294. Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code §§ 7-2-314, *et seq.*; Alaska Stat. §§ 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq.*; Ark. Code Ann. §§ 4-2-314, *et seq.*; Cal. Com. Code §§ 2314, *et seq.*; Colo. Rev. Stat. §§ 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, §§ 2-314, *et seq.*; D.C. Code Ann. §§ 28:2-314, *et seq.*; Fla. Stat. Ann. §§ 672.314, *et seq.*; O.C.G.A. §§ 11-2-314, *et seq.*; Haw. Rev. Stat. §§ 490:2-314, *et seq.*; Idaho Code §§ 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. §§ 26-1-2-314, *et seq.*; Iowa Code Ann. §§ 554.2314, *et seq.*; Kan. Stat. Ann. §§ 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. §§ 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq.*; Md. Code Ann., Com. Law §§ 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq.*; Mich. Comp. Laws Ann. §§ 440.2314, *et seq.*; Minn. Stat. Ann. §§ 336.2-314, *et seq.*; Miss. Code Ann. §§ 75-2-314, *et seq.*; Mo. Rev. Stat. §§ 400.2-314, *et seq.*; Mont. Code Ann. §§ 30-2-314, *et seq.*; Neb. Rev. Stat. §§ 2-314, *et seq.*; Nev. Rev. Stat. §§ 104.2314, *et seq.*; N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq.*; N.J. Stat. Ann. §§ 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law §§ 2-314, *et seq.*; N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq.*; N.D. Cent. Code §§ 41-02-31, *et seq.*; Ohio Rev. Code Ann. §§ 1302.27, *et seq.*; Okla. Stat. tit. 12A, §§ 2-314, *et seq.*; Or. Rev. Stat. §§ 72.3140, *et seq.*; 13 Pa. Stat. Ann. §§ 2314, *et seq.*; R.I. Gen. Laws §§ 6A-2-314, *et seq.*; S.C. Code Ann. §§ 36-2-314, *et seq.*; S.D. Codified Laws §§ 57A-2-314, *et seq.*; Tenn. Code Ann. §§ 47-2-314, *et seq.*; Tex. Bus. & Com. Code §§ 2.314, *et seq.*; Utah Code Ann. §§ 70A-2-314, *et seq.*; Va. Code Ann. §§ 8.2-314, *et seq.*; Vt. Stat.

Ann. tit. 9A, §§ 2-314, *et seq*.; Wash. Rev. Code §§ 62A.2-314, *et seq*.; W. Va. Code §§ 46-2-314,

*et seq*.; Wis. Stat. Ann. §§ 402.314, *et seq*.; and Wyo. Stat. Ann. §§ 34.1-2-314, *et seq*.

295.    Defendants breached the implied warranty of merchantability in connection with

the sale of PGT-A. While Defendants advertise, market, and promote that its PGT-A testing is

substantiated, accurate and reliable, it is not, rendering it unsuitable for use.

296.    Had Plaintiffs and the Nationwide Class members known that Defendants' PGT-A

was unproven, inaccurate, and unreliable, they would not have purchased it.

297.    To the extent privity may be required, Plaintiffs and the Nationwide Class members

can establish privity with Defendants because Plaintiffs purchased PGT-A from Defendants.

298.    As a direct and proximate result of Defendants' breach of the implied warranty of

merchantability, Plaintiffs and the Nationwide Class have sustained damages in an amount to be

determined at trial.

## COUNT V
### Breach of the Implied Warranty of Usability
### (On behalf of Plaintiffs and the Nationwide Class)

299.    Plaintiffs incorporate by reference all preceding allegations.

300.    By operation of law, Defendants, as the seller and provider of PGT-A testing,

warranted to Plaintiffs and the Nationwide Class members through its statements that PGT-A was

usable for its ordinary and intended use.

301.    Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

302.    Such implied warranty of usability, contained in U.C.C. § 2-314, has been codified

in each state. *See, e.g.*, Ala. Code §§ 7-2-314, *et seq*.; Alaska Stat. §§ 45.02.314, *et seq*.; Ariz. Rev.

Stat. Ann. §§ 47-2314, *et seq*.; Ark. Code Ann. §§ 4-2-314, *et seq*.; Cal. Com. Code §§ 2314, *et*

*seq*.; Colo. Rev. Stat. §§ 4-2-314, *et seq*.; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq*.; Del. Code

Ann. tit. 6, §§ 2-314, *et seq*.; D.C. Code Ann. §§ 28:2-314, *et seq*.; Fla. Stat. Ann. §§ 672.314, *et seq*.; O.C.G.A. §§ 11-2-314, *et seq*.; Haw. Rev. Stat. §§ 490:2-314, *et seq*.; Idaho Code §§ 28-2-314, *et seq*.; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq*.; Ind. Code Ann. §§ 26-1-2-314, *et seq*.; Iowa Code Ann. §§ 554.2314, *et seq*.; Kan. Stat. Ann. §§ 84-2-314, *et seq*.; Ky. Rev. Stat. Ann. §§ 355.2-314, *et seq*.; La. Civ. Code Ann. art. 2520, *et seq*.; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq*.; Md. Code Ann., Com. Law §§ 2-314, *et seq*.; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq*.; Mich. Comp. Laws Ann. §§ 440.2314, *et seq*.; Minn. Stat. Ann. §§ 336.2-314, *et seq*.; Miss. Code Ann. §§ 75-2-314, *et seq*.; Mo. Rev. Stat. §§ 400.2-314, *et seq*.; Mont. Code Ann. §§ 30-2-314, *et seq*.; Neb. Rev. Stat. §§ 2-314, *et seq*.; Nev. Rev. Stat. §§ 104.2314, *et seq*.; N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq*.; N.J. Stat. Ann. §§ 12A:2-314, *et seq*.; N.M. Stat. Ann. § 55-2-314, *et seq*.; N.Y. U.C.C. Law §§ 2-314, *et seq*.; N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq*.; N.D. Cent. Code §§ 41-02-31, *et seq*.; Ohio Rev. Code Ann. §§ 1302.27, *et seq*.; Okla. Stat. tit. 12A, §§ 2-314, *et seq*.; Or. Rev. Stat. §§ 72.3140, *et seq*.; 13 Pa. Stat. Ann. §§ 2314, *et seq*.; R.I. Gen. Laws §§ 6A-2-314, *et seq*.; S.C. Code Ann. §§ 36-2-314, *et seq*.; S.D. Codified Laws §§ 57A-2-314, *et seq*.; Tenn. Code Ann. §§ 47-2-314, *et seq*.; Tex. Bus. & Com. Code §§ 2.314, *et seq*.; Utah Code Ann. §§ 70A-2-314, *et seq*.; Va. Code Ann. §§ 8.2-314, *et seq*.; Vt. Stat. Ann. tit. 9A, §§ 2-314, *et seq*.; Wash. Rev. Code §§ 62A.2-314, *et seq*.; W. Va. Code §§ 46-2-314, *et seq*.; Wis. Stat. Ann. §§ 402.314, *et seq*.; and Wyo. Stat. Ann. §§ 34.1-2-314, *et seq*.

303.    Defendants by their advertising, marketing, and sale of PGT-A to Plaintiffs and the Nationwide Class, impliedly warrant that its product is usable.

304.    Defendants breached the implied warranty of usability in connection with its sale of PGT-A testing, as it contained defects and suffered from issues that were not readily apparent to consumers.

305.    Defendants knew or should have known that PGT-A is unproven and does not produce accurate or reliable results to such an extent that it is unusable.

306.    To the extent privity may be required, Plaintiffs and the Nationwide Class can establish privity with Defendants as they purchased PGT-A from Defendants.

307.    Had Plaintiffs and Nationwide Class members known that they would not be able to use the results of Defendants' PGT-A, they would not have purchased it or would have paid significantly less for it.

308.    As a direct and proximate result of Defendants' breach of the implied warranty of usability, Plaintiffs and the Nationwide Class have sustained damages in an amount to be determined at trial.

<u>**COUNT VII**</u>
**Breach of Express Warranty**
**(On behalf of Plaintiffs and the Nationwide Class)**

309.    Plaintiffs incorporate by reference all preceding allegations.

310.    By advertising and selling PGT-A testing, Defendants made promises and affirmations of fact about PGT-A testing through its marketing and advertising statements, patient brochure, Consent Form, test results, and as further set forth above.

311.    These promises and affirmations constitute an express warranty U.C.C. § 2-313 and became the basis for the purchase of PGT-A testing by Plaintiff and Nationwide Class members from Defendants.

312.    Defendants purport, through its marketing and advertising, patient brochure, consent forms, statements, and test results that its PGT-A testing is accurate and reliable, among other things as detailed here.

313.    Despite Defendants' express warranties about accuracy and reliability, its PGT-A testing is not accurate or reliable.

314.    Defendants' PGT-A testing is therefore not what Defendants represented it to be.

315.    Accordingly, Defendants breached express warranties about PGT-A because its PGT-A testing does not conform to Defendants' affirmations and promises that the testing is accurate and reliable.

316.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs and the Nationwide Class have sustained damages in an amount to be determined at trial.

**COUNT VI**
**Fraud**
**(On behalf of Plaintiffs and the Nationwide Class)**

317.    Plaintiffs incorporate by reference all preceding allegations.

318.    Defendants created and implemented a scheme to market its PGT-A to increase sales through false and misleading statements and material omissions, including, for example, that:

a.    Defendants' PGT-A testing has some of the highest success rates in the nation;

b.    Defendants' PGT-A testing significantly reduces the risk of miscarriage (less than 5%);

c.    Defendants' PGT-A testing increases live birth rates;

d.    Defendants' PGT-A testing increases the chance of pregnancy;

e.    Defendants' PGT-A testing delivers the highest rate of chromosomally normal embryos for patients;

f.    Defendants' PGT-A testing reports the lowest chromosomal mosaicism rates in the United States;

g.    Defendants' PGT-A testing provides the fastest path to a successful live birth; and

h.   Defendants' PGT-A testing is 95-98% accurate.

319.    Defendants' conduct was fraudulent and deceptive because its misrepresentations and omissions were likely to, and did, deceive consumers, including Plaintiffs and the Nationwide Class.

320.    Defendants knew or should have known that its misrepresentations and omissions were false and misleading and intended for consumers to rely on.

321.     Plaintiffs and the Nationwide Class members have been injured because they paid for PGT-A and suffered economic losses based upon the material misrepresentations and omissions of Defendants.

322.    Defendants' false statements and omissions induced Plaintiffs and Nationwide Class members to purchase Defendants' PGT-A.

323.    Defendants' advertising, marketing, and promotion of PGT-A fraudulently concealed the truth about PGT-A as alleged herein. Accordingly, Plaintiffs and the Nationwide Class could not have known that they were subject to deceptive and misleading marketing and promotion.

324.    Absent Defendants' conduct, Plaintiffs and Nationwide Class members would not have purchased PGT-A from Defendants and are entitled to a full refund of the purchase price and additional economic losses. In the alternative, Plaintiffs and Nationwide Class members are entitled to the difference in value between the unproven and unreliable test Plaintiffs and Nationwide Class members purchased and the test Defendants advertised.

325.    As a result of Defendants' false and deceptive conduct, Plaintiffs and Nationwide Class members are entitled to monetary, compensatory, treble, and punitive damages, injunctive

relief, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

**COUNT VII**
**Fraud by Concealment**
**(On behalf of Plaintiffs and the Nationwide Class)**

326.　Plaintiffs incorporate by reference all preceding allegations.

327.　Defendants intentionally suppressed and concealed material facts about its PGT-A testing as alleged herein. Defendants knew about the problems and issues with PGT-A, that it was unproven, inaccurate, and unreliable, as well as the status of scientific knowledge concerning PGT-A but failed to disclose these material facts to Plaintiffs and Nationwide Class members.

328.　Plaintiffs and Nationwide Class members had no reasonable means of knowing that Defendants' representations concerning PGT-A were materially incomplete, false, or misleading, or that Defendants had failed to disclose relevant material facts about PGT-A. Plaintiffs and Nationwide Class members did not and reasonably could not have discovered Defendants' deceit before they purchased PGT-A as an add-on to their IVF treatment.

329.　Had Plaintiffs and Nationwide Class members known the truth, and of the material facts that Defendants omitted to disclose to them, they would not have purchased PGT-A from Defendants and incurred economic costs.

330.　Defendants had a duty to disclose the truth because the facts that Defendants choose not to disclose are material and Defendants possessed knowledge of these facts that unsuspecting and vulnerable consumers did not have.

331.　Defendants was aware of the scientific study and research concerning PGT-A as Defendants reviewed the research and publications concerning PGT-A, including from major medical associations such as ASRM.

332.    Defendants had a duty to disclose the truth about PGT-A because, through Defendants' advertising, marketing, website statements, patient brochures, consent form, and other written statements made to consumers, Defendants made partial representations regarding PGT-A including purported representations concerning its reliability and accuracy, but failed to disclose facts that would have materially qualified those partial representations.

333.    Having volunteered purportedly scientific and research-based information relating to PGT-A to Plaintiffs and Nationwide Class members, Defendants had a duty to disclose the whole truth about PGT-A and its unproven, inaccurate, and unreliable nature.

334.    Each Plaintiff and Nationwide Class member was exposed to Defendants' representations prior to and immediately after purchase. Each Plaintiff and Nationwide Class member saw the same generalized representations as detailed herein, that were repeated by Defendants throughout its promotional materials. None of the informational sources that Plaintiffs and Nationwide Class members were provided by Defendants, including advertisements, websites, brochures, or promotional materials indicated or disclosed the full truth about PGT-A testing as detailed herein.

335.    Defendants concealed the truth to sell more PGT-A testing and to avoid the public finding out the truth about PGT-A.

336.    The facts that Defendants suppressed and omitted were material, and Plaintiffs and Nationwide Class members were unaware of them at the time of purchase. Had the facts been disclosed, Plaintiffs and Nationwide Class members would not have purchased PGT-A and incurred the associated economic costs by which they were damaged.

337.    When deciding whether to purchase PGT-A, Plaintiffs and Nationwide Class members reasonably relied to their detriment on Defendants' material misrepresentations and omissions as detailed herein.

338.    Plaintiffs and Nationwide Class members sustained damages in the form of economic costs as a direct and proximate result of Defendants' deceit and fraudulent concealment.

339.    Defendants' fraudulent concealment was malicious, oppressive, deliberate, intended to defraud Plaintiffs and Nationwide Class members, and intended to enrich Defendants, and has been in reckless disregard of Plaintiffs' and Nationwide Class members' rights, interests, and well-being. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof at trial.

## COUNT VIII
### Trespass to Chattels
### (On behalf of Plaintiffs and the Nationwide Class)

340.    Plaintiffs incorporate by reference all preceding allegations.

341.    Defendants have committed common law trespass to chattel.

342.    Plaintiffs' and Nationwide Class members' embryos were at all relevant times their personal property.

343.    Defendants only allow embryos with a "normal" result to be transferred. [133]

> After CCS, only embryos that have the correct number of chromosomes are selected for transfer.

344.    Defendants have intentionally interfered with Plaintiffs' and Nationwide Class members' embryos that have a "mosaic" or "abnormal" result based upon Defendants' PGT-A testing, which as discussed above is not accurate and not validated.

---

[133] https://www.ccrmivf.com/services/comprehensive-chromosome-screening-ccs/ (last visited February 13, 2025).

345.    Defendants further require that embryos with an "abnormal" result based upon PGT-A testing be either a) utilized for research or b) discarded.[134]

Embryos determined to be aneuploid will be either (select one):

_____ Utilized to facilitate ongoing improvements and advances in CCS, PGT and CCRM research; or

__X__ Discarded in accordance with normal laboratory procedures and applicable laws.

346.    For embryos with an "abnormal" or "mosaic" result that Plaintiffs and Nationwide Class members want to transfer or move to another facility, Defendants intentionally interfere in the Plaintiffs' possession or use of those embryos.

347.    As a direct and proximate result of Defendants' intentional interference, Plaintiffs and Nationwide Class members have sustained damages in the form of economic costs and the loss of use of their embryos that do not have a "normal" result based upon Defendants' PGT-A testing.

## COUNT IX
### Conversion
### (On behalf of Plaintiffs and the Nationwide Class)

348.    Plaintiffs incorporate by reference all preceding allegations.

349.    Plaintiffs' and Nationwide Class members' embryos were at all relevant times their personal property.

350.    If an embryo is deemed aneuploid by Defendants' PGT-A, Defendants do not return the embryo to the Plaintiffs and the Nationwide Class members. Instead, Defendants only allow Plaintiffs and Nationwide Class members to choose to have their embryos used in research or

---

[134] CCRM Preimplantation Genetic Testing (PGT) and/or Comprehensive Chromosome Screening (CCS) with Embryos Transfer Consent, Acknowledgment and Release.

discarded.[135]

Embryos determined to be aneuploid will be either (select one):

_____ Utilized to facilitate ongoing improvements and advances in CCS, PGT and CCRM research; or

__X____ Discarded in accordance with normal laboratory procedures and applicable laws.

351.    Defendants have converted Plaintiffs' and Nationwide Class members' embryos with an "abnormal" or "mosaic" result based upon Defendants' PGT-A testing.

352.    Defendants are aware of the lengths to which individuals undergoing IVF go to create embryos and how valuable embryos are.

353.    Defendants are not authorized to obtain, retain, or exercise control, dominion or ownership of Plaintiffs' and Nationwide Class members' embryos.

354.    Defendants knowingly obtained, retained, and exercised control, dominion and ownership over Plaintiffs' and Nationwide Class members' embryos.

355.    Defendants specifically intended to permanently deprive the Plaintiffs and Nationwide Class members of their embryos.

356.    Defendants have refused to return the Plaintiffs' and Nationwide Class members' embryos.

357.    Plaintiffs and Nationwide Class members have been deprived of the possession and use of their embryos.

358.    Plaintiffs and Nationwide Class members sustained damages in the form of economic costs and loss of use of their embryos as a direct and proximate result of Defendants' conversion.

---

[135] CCRM Preimplantation Genetic Testing (PGT) and/or Comprehensive Chromosome Screening (CCS) with Embryos Transfer Consent, Acknowledgment and Release.

## COUNT X
### Unjust Enrichment
### (On behalf of Plaintiffs and the Nationwide Class)

359.    Plaintiffs incorporate by reference all preceding allegations.

360.    Plaintiffs plead this claim in the alternative to their other claims to the extent there
is no adequate remedy at law.

361.    Defendants created and implemented a scheme to market for PGT-A testing to
increase sales through numerous false and misleading statements and material omissions as set
forth above.

362.    As a result, Defendants have been unjustly enriched.

363.    Defendants received a measurable benefit at the expense of Plaintiffs and
Nationwide Class members in the form of payment for PGT-A testing and associated costs.

364.    Defendants accepted monetary benefits from Plaintiffs and Nationwide Class
members at the detriment of Plaintiffs and Nationwide Class members.

365.    These benefits were the result of Defendants acting in its pecuniary interest at the
expense of its consumers.

366.    There is no justification for Defendants' enrichment. It would be inequitable,
unconscionable, and unjust for Defendants to be permitted to retain benefits because the benefits
were procured as a result of its wrongful conduct.

367.    Plaintiffs and Nationwide Class members are entitled to full restitution of the
benefits that Defendants unjustly received and/or any amounts necessary to return Plaintiffs and
Nationwide Class members to the position they occupied prior to purchasing PGT-A from
Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes defined above, respectfully request that the Court:

a.      Determine that Defendants is liable for the violations set forth above;

b.      Award Plaintiffs and the Classes defined above all compensatory, statutory, restitution, and punitive damages as provided by law;

c.      Grant appropriate equitable relief, including, without limitation, an order requiring Defendants to adequately disclose the true nature of PGT-A testing;

d.      Certify each Class as defined herein, designating Plaintiffs as Class representatives, and appointing the undersigned counsel as Class Counsel;

e.      Declare that Defendants are financially responsible for notifying the Class members of the pendency of this action;

f.      Require that Defendants disgorge amounts wrongfully obtained for PGT-A testing and award injunctive relief as permitted by law or equity, including enjoining Defendants from engaging in misleading and deceptive practices going forward;

g.      Schedule a trial by jury in this action on all claims so triable;

h.      Award Plaintiffs' reasonable attorneys' fees, costs, and expenses, as provided by law;

i.      Award Plaintiffs and Class members trebled, statutory, and/or punitive damages as authorized by law;

j.      Award pre-judgment and post-judgment interest on any amounts awarded, as provided by law; and

k.      Grant such further relief that the Court deems appropriate.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs request a trial by jury of all

issues triable as of right.

Dated: May 5, 2025                              Respectfully submitted,


                                               s/ Seth A. Katz
                                               Seth A. Katz (Colorado Bar No. 37205)
                                               Sarah H. Boelts (Colorado Bar No. 60293)
                                               BURG SIMPSON
                                               ELDREDGE HERSH & JARDINE, P.C.
                                               40 Inverness Drive East
                                               Englewood, CO 80112
                                               Telephone: (303) 792-5595
                                               Email: skatz@burgsimpson.com
                                               sboelts@burgsimpson.com

<u>Co-Counsel</u>:
Allison S. Freeman* (Florida Bar No. 69539)
CONSTABLE LAW, P.A.
139 6th Avenue S
Safety Harbor, Florida 34695
Telephone: (727) 797-0100
Email: allison@constable-law.com

Paula S. Bliss* (Massachusetts BBO No. 352361)
JUSTICE LAW COLLABORATIVE LLC
210 Washington St.
No. Easton, MA 02356
Telephone: (508) 230-2700
Email: paula@justicelc.com

Shanon J. Carson* (Pennsylvania Bar No. 85957)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Email: scarson@bm.net

*Application for admission to be filed
*Attorneys for Plaintiffs*